UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
:
INTELLECTUAL CAPITAL PARTNER,                     :
:
                Plaintiff,          :        1:08-cv-10580 (DC)
:
         - against -              :
:
INSTITUTIONAL CREDIT PARTNERS LLC,   :
:        ORAL ARGUMENT
:        REQUESTED
                Defendant.       :
:
---------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT INSTITUTIONAL CREDIT PARTNERS LLC'S MOTION TO DISMISS THE COMPLAINT

Christopher J. Clark
Angela M. Papalaskaris
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Email: cjclark@dl.com
Email: apapalaskaris@dl.com

*Attorneys for Defendant
Institutional Credit Partners LLC*

Dated: March 6, 2009

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .....................................................................................................................1

FACTUAL BACKGROUND .....................................................................................................2

ARGUMENT .............................................................................................................................5

    1. IntelCap Cannot Establish Breach of Contract Because It Failed to
       Perform Under the Agreement ....................................................................................6

    2. IntelCap's Repudiation of the Agreement Constitutes a Material Breach,
       Which Relieves ICP of Any Obligations Under the Agreement ...................................8

    3. Because IntelCap Has Not Properly Alleged Breach of Contract, It Is
       Not Entitled to Declaratory Relief ..............................................................................11

    4. No Fiduciary Relationship between IntelCap and ICP Precludes an
       Accounting ................................................................................................................12

    5. Claims for Unjust Enrichment and Quantum Meruit Are Duplicative
       and Should Be Dismissed ..........................................................................................13

CONCLUSION ........................................................................................................................16

# TABLE OF AUTHORITIES

**CASES**                                                                                                                   **Page(s)**

*150 Broadway N.Y. Associates, L.P. v. Bodner,* 14 A.D.3d 1, 784
   N.Y.S.2d 63 (1st. Dep't 2004) .................................................................................. 10

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir.
   2007) ............................................................................................................................. 5

*Atla-Medine v. Compton Corp.*, 2001 WL 170666 (S.D.N.Y. Feb. 21,
   2001) ........................................................................................................................... 14

*Bauman Assocs. v. H&M Int'l Transp., Inc.*, 171 A.D.2d 479, 567
   N.Y.S.2d 404 (1st Dep't 1991) .................................................................................... 14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007) ............................... 5

*Bradford v. Sonet*, 64 N.Y.S.2d 876 (N.Y. Sup. Ct. 1946) .................................................. 10

*Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70,
   747 N.Y.S.2d 468 (1st Dep't 2002) ...................................................................... 8, 9, 10

*E.R. Squibb & Sons v. Ira J. Shapiro, Inc.*, 64 N.Y.S.2d 368 (N.Y. Sup.
   Ct. 1945) ..................................................................................................................... 10

*Excel Graphics Technologies, Inc. v. CFG/AGSCB 75 Ninth Avenue, LLC,*
   1 A.D.3d 65, 767 N.Y.S.2d 99 (1st Dep't 2003) .......................................................... 11

*Fallon v. McKeon*, 230 A.D.2d 629, 646 N.Y.S.2d 109 (1st Dep't 1996) ........................... 14

*In re Food Mgmt. Group, LLC*, 372 B.R. 171 (S.D.N.Y. 2007) ...................................... 6, 8

*Goodman Manufacturing Co. L.P. v. Raytheon Co.*, 1999 WL 681382
   (S.D.N.Y. 1999) ......................................................................................................... 8, 9

*LILCO v. County of Suffolk*, 604 F. Supp. 759 (E.D.N.Y. 1985) ....................................... 12

*Lemnos Broad Silk Works, Inc. v. Spiegelberg*, 127 Misc. 855, 217 N.Y.S.
   595 (Sup. Ct. 1926) ..................................................................................................... 12

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418
   F.3d 168 (2d Cir. 2005) ............................................................................................... 13

*Millennium Expressions, Inc. v. Chauss Marketing, Ltd.*, 2007 WL
   950070 (S.D.N.Y. Mar. 30, 2007) ............................................................................... 13

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 705 N.E.2d 656 (1998) ................................................................ 12

*Parekh v. Swissport Cargo Services, Inc.*, 2009 WL 290465 (E.D.N.Y. Feb. 5, 2009) ....................................................................................................... 5

*Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900 (2d Dep't 1976) ............................ 12

*Preiser v. Newkirk*, 422 U.S. 395, 95 S. Ct. 2330 (1975) ..................................................... 12

*Roberts v. Karimi*, 251 F.3d 404 (2d Cir. 2001) .............................................................. 6, 7

*S.O. Textiles Co., Inc. v. A&E Prods. Group*, 18 F. Supp. 2d 232 (E.D.N.Y. 1998) ................................................................................................. 13

*Sayer v. Wilstrop*, 200 A.D. 364, 193 N.Y.S. 4 (3d Dep't 1922) ........................................ 12

*UMG Recordings, Inc. v. Fubu Records, LLC,* 34 A.D.3d 293, 824 N.Y.S.2d 83 (1st Dep't 2006) ................................................................................... 10

*WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 724 N.Y.S.2d 66 (2d Dep't 2001) ................................................................................................................... 12

*In re Yukos Oil Co. Sec. Litig.,* 2006 WL 3026024 (S.D.N.Y. Oct 25, 2006) ....................................................................................................................... 5

**OTHER AUTHORITIES**

13 Williston on Contracts § 39:38 (4th ed) ............................................................................. 8

Restatement (Second) of Contracts § 250 (1981) .................................................................. 8

Defendant Institutional Credit Partners LLC ("ICP") by and through its undersigned counsel, hereby moves this Court to dismiss the allegations in the above-captioned Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## **INTRODUCTION**

It is not every day that a plaintiff fails, as a matter of law, to allege a breach of contract. This, however, is such a case.

Intellectual Capital Partner ("IntelCap") brings this action alleging breach of a Consulting Services Agreement (the "Agreement") between it and ICP. Incredibly though, IntelCap admits in its Complaint that it unilaterally and prematurely ended its contractual relationship with ICP to pursue a better opportunity. It did so almost five months before it had any contractual right to terminate the Agreement and in direct violation of the Agreement's term provision. The Agreement does not contemplate one party abandoning its contractual obligations simply to serve its own business purposes. IntelCap's actions, as alleged in the Complaint, therefore constituted a material breach of the Agreement.

Now, IntelCap seeks an astounding 50% of the fees earned by ICP in a transaction between ICP and a third party that was announced in October 2008. IntelCap claims that this transaction is governed by the terms of the Agreement. It is not. Moreover, having abandoned ICP for a better deal – and therefore having breached the Agreement – over fourteen months earlier, IntelCap is in no position to make a claim for breach of contract against ICP. It is indisputable that a party asserting a breach of contract must allege that it fully performed its portion of the agreement. IntelCap cannot, and does not, so allege.

As a matter of law, furthermore, this undisputed fact establishes not only that IntelCap failed to perform under the Agreement, but also that IntelCap's failure amounts to a repudiation of the Agreement. It is well settled that such repudiation excuses any obligations that ICP had under the Agreement. Consequently, IntelCap cannot present any factual allegations that would allow it to prevail against ICP on its breach of contract claim.

For the same reasons that IntelCap cannot properly allege a breach of contract, it cannot demonstrate that there is an actual controversy warranting the issuance of a declaratory judgment regarding the Agreement's enforceability. Simply put, if a plaintiff

1

cannot show a breach of contract by the defendant, the plaintiff cannot allege that there is a ripe and justiciable controversy concerning the contract's interpretation.

In addition, IntelCap has not established a right to an accounting because IntelCap cannot allege the prerequisite to an action for an accounting: a fiduciary relationship. IntelCap alleges no fiduciary relationship between it and ICP, and there in fact was none. This was a straightforward, arms-length agreement between two sophisticated business entities. It could not be farther from a fiduciary scenario. This claim, along with all the others, should be dismissed.

Finally, IntelCap's claims for unjust enrichment and quantum meruit fail for the same reason as its breach of contract claim. Those claims – which under New York law are one claim alone – require that a plaintiff allege the performance of services in good faith. Here, once again, the allegations state the opposite: IntelCap abandoned the Agreement and failed to perform its services, in good faith or otherwise. Moreover, these allegations are indistinguishable from those underlying IntelCap's breach of contract claim. Such pleading is patently insufficient to state an unjust enrichment or quantum meruit claim.

## **FACTUAL BACKGROUND**[1]

ICP was established in 2004 and specializes in fixed income capital markets and asset management services. Operating as a boutique firm with offices in New York and London, ICP provides financing solutions for corporations worldwide in such areas as maritime fleet acquisitions, equipment leasing, energy and power plant construction.

IntelCap was also organized in 2004 under the laws of Luxembourg by its sole owner, Yves Soyfer. Compl. ¶15. IntelCap operates as a Luxembourg entity although the company focuses its business operations in Latin America, primarily Mexico. *Id*.

In January 2007, ICP and IntelCap entered into the Agreement whereby IntelCap agreed to provide certain services to ICP. In particular, IntelCap was engaged as a consultant to assist ICP "with business development outside of the United States of America in the origination of assets on which structured finance techniques can be applied." *Id*., Ex. A, ¶1. In return for these services, ICP agreed to pay IntelCap a pro-

---

[1] ICP vigorously disputes IntelCap's version of the facts, but for purposes of this motion to dismiss assumes the truth of the allegations in the Complaint as required by law.

rated consulting fee in the amount of $200,000 on a bi-weekly basis. *Id.*, Ex. A, ¶2(a). The parties also agreed that the fees for any deal which generated more than $10 million in gross revenue would be shared equally by ICP and IntelCap. *Id.*, Ex. A, ¶2(b). Section 2(b) was subject to a survival clause that addressed "termination" of the Agreement. *Id.*, Ex. A, ¶11.

Termination, as well as term, is governed by Section 3 of the Agreement. *Id.*, Ex. A, ¶3. The only way in which either party could terminate the Agreement under Section 3 was to abide by its terms at least until the end of December 2007 and then to deliver "written notice to the other party" at the end of the calendar year in question. *Id.* The Agreement provides no other means by which termination can be made. For term, Section 3 of the Agreement requires that "[t]his Agreement shall continue until December 31, 2007." After that point, "it may be extended for an additional year upon approval" by both the parties, and subsequently extended on an annual basis, "until one or both of the parties terminate this Agreement pursuant to this Section 3." *Id.*

IntelCap alleges that it performed under the Agreement by "providing ICP with insight on the Mexican market, access to IntelCap's exclusive contacts, and information regarding PEMEX contracts, as well as connecting ICP with IntelCap's clients and PEMEX contractors, including [a company called] Blue Marine."[2] *Id.*, ¶24.

According to the Complaint, "Blue Marine had immediate needs for structured financing models for a number of transactions related to PEMEX contracts it had been awarded, as well as in preparation for a number of upcoming contracts that it hoped would be awarded to it by PEMEX." *Id.*, ¶24. ICP, IntelCap, and Blue Marine began working together to develop structured financing techniques for one transaction that involved developing a structured financing package that would allow Blue Marine to acquire five tankers. *Id.*, ¶¶25-26.

Shortly thereafter, in or about April 2007, IntelCap asked ICP to enter into a separate non-disclosure agreement. The purpose of such an agreement was to prevent ICP from soliciting or doing work on behalf of IntelCap's clients during the parties' relationship and for a period of time after termination of the Agreement. *Id.*, ¶28. The

---

[2] PEMEX, or Petroleos Mexicanos, is a state-owned petroleum company located in Mexico. Compl. ¶17. Blue Marine is a PEMEX shipping contractor. *Id.*, ¶19.

3

parties did not enter into this agreement, but instead agreed to modify the Agreement to address non solicitation of clients. Accordingly, Section 6 of the Agreement provides as follows:

> While the Consultant is performing service for the Company in accordance with this Agreement and for a period of three years after any termination of the Agreement, both the Consultant and the Client will not solicit business or perform work for the clients of the other party (i.e. the Company will not solicit business or perform work for the Consultant's clients and the Consultant will not solicit business or perform work for the Company's clients), either directly or indirectly, or participate or assist any other entity, in any way, in any other entity's solicitation of business from or performance of work for each of the Consultant's or Company's respective clients.

Appendix B of the Agreement sets forth a list of IntelCap's clients, which includes Blue Marine. *Id*., Ex. A, App. B.

For the next three to four months, the parties continued to work together. In exchange, ICP paid the consulting fee due under the Agreement via wire transfers to IntelCap's Luxembourg bank account. *Id*., ¶31.

ICP expected its relationship with IntelCap to continue until, at the earliest, December 31, 2007. Notwithstanding the term and termination provision of the Agreement, Mr. Sofyer, on behalf of IntelCap, abandoned the Agreement on August 8, 2007 to pursue another business partnership with Mizuho International ("Mizuho"). *Id*., ¶32. Mizuho is the London based securities and investment banking arm of the Mizuho Financial Group, one of Japan's largest banks. *Id*. Although neither party had a contractual right to terminate the Agreement before December 31, 2007, Mr. Soyfer informed ICP that IntelCap must discontinue working with ICP under the Agreement because it decided to partner with Mizuho. *Id*. He did not, however, seek to end the parties' relationship under the termination provision of the Agreement. It is not alleged that IntelCap was compelled to abandon the Agreement for any reason other than the prospect of a better deal with Mizuho.

After August 8, 2007, IntelCap discontinued the provision of any and all services to ICP under the Agreement. ICP immediately requested that IntelCap propose a method

4

for reimbursing ICP for consulting fees previously paid to IntelCap and made no further payments to IntelCap under the Agreement. *Id*., ¶33. ICP also rejected several overtures made by IntelCap to modify the Agreement in order to allow for a joint venture between IntelCap, ICP and Mizuho in the months following IntelCap's repudiation of the Agreement. *Id*., ¶34.

Over a year and two months later, on October 14, 2008, it was announced that ICP had structured and arranged a $121 million financing package for Blue Marine, which would allow that company to acquire and lease two shipping vessels to PEMEX. *Id*., ¶37. The Complaint alleges that this deal is part of the same transaction that IntelCap worked on with ICP and Blue Marine before repudiating the Agreement. *Id*.

IntelCap, through its attorneys, sent a letter to ICP on November 4, 2008. It demanded documentation about the transaction and also payment in accordance with the fee sharing provision of the Agreement. *Id*., ¶39. After approximately a week had passed without a response, IntelCap's attorneys sent a second letter reiterating these same demands. *Id*., ¶40. ICP responded through its counsel, on November 24, 2008, stating that it would not provide the requested documentation or payment. It explained that IntelCap breached the Agreement on August 8, 2007 and was therefore not entitled to participate in fee sharing under the Agreement.

## ARGUMENT

On a Rule 12(b)(6) motion to dismiss, the allegations of the complaint must be accepted as true and the plaintiff is entitled to all reasonable inferences that can be drawn in its favor. *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "Nevertheless, to survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of 'plausibility.'" *Parekh v. Swissport Cargo Services, Inc.*, 2009 WL 290465, *2 (E.D.N.Y. Feb. 5, 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1970 (2007)). This requires the right to relief to rise "above the speculative level." *Twombly*, 127 S. Ct. at 1965. The Court may consider documents attached to the complaint on a motion to dismiss. *See ATSI Communications*, 493 F.3d at 98. "The Court need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint." *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, *12 (S.D.N.Y. Oct. 25, 2006).

In this case, IntelCap attempts to set forth a straightforward action against ICP for breach of contract with additional claims based on the same underlying conduct. In the end, IntelCap is seeking to recover half of the fees earned by ICP in connection with the Blue Marine transaction that was announced in October 2008. It contends that, under the Agreement, there are certain provisions that survived termination which entitle IntelCap to enforce the Agreement. Yet IntelCap does not allege that it properly terminated the Agreement. IntelCap concedes that it abandoned the Agreement on August 8, 2007, several months before it had any right to do so. Not only does this establish that IntelCap failed to perform under the Agreement, but it also evidences that IntelCap materially breached the Agreement. As a matter of fact IntelCap's breach precludes, and therefore as a matter of law excuses, the performance of ICP's obligations under the Agreement.

IntelCap cannot allege any set of facts that would make its claim plausible and entitle it to recovery for breach of contract. Nor can it use the same underlying conduct to establish its remaining claims. Consequently, this action must be dismissed.

**1.      IntelCap Cannot Establish Breach of Contract Because It Failed to Perform Under the Agreement**

New York law is well settled that "in order to prevail on a breach of contract claim, a plaintiff must prove (1) the existence of a contract, (2) breach of the contract by the defendant, (3) performance by plaintiff unless excused or precluded and (4) damages resulting from that breach." *In re Food Management Group, LLC*, 372 B.R. 171, 188 (S.D.N.Y. 2007) (applying New York law). It is insufficient to merely attach a written agreement to the complaint in order to maintain a breach of contract claim. In addition to an enforceable contract, the plaintiff must also show "that he 'performed what he was obligated to do under the terms of the contract [and] was ready, willing and able to do all that the contract required.'" *Roberts v. Karimi*, 251 F.3d 404, 407 (2d Cir. 2001) (citations omitted).

IntelCap alleges that it "performed its obligations under the Agreement, providing ICP with insight on the Mexican market, access to IntelCap's exclusive contacts, and information regarding PEMEX contracts, as well as connecting ICP with IntelCap's exclusive clients, including Blue Marine, and other PEMEX contractors." *See* Compl., ¶43. This allegation is repeated in conclusory fashion throughout the Complaint. *See id.*

¶¶3, 24.  This, however, directly contradicts IntelCap's admission that, on August 8, 2007, Mr. Soyfer told ICP that IntelCap was unable to perform under the Agreement.  *Id*., ¶32.  By its own allegations, therefore, IntelCap concedes that it did not perform according to the terms of the Agreement.

Section 3 of the Agreement explicitly obligated each party to perform at least until December 31, 2007.  *Id*., Ex. A, ¶3.  The Agreement – and all the covenants therein – were based on the parties' understanding that each party would perform for at least a year.  Yet, IntelCap failed to meet this obligation.  There is no allegation that IntelCap performed under the Agreement after August 8, 2007.  Rather, the Complaint alleges that IntelCap was "not able" to provide services to ICP and Mizuho at the same time, showing that IntelCap was not "ready, willing or able to do all that the contract required." *Roberts*, 251 F.3d at 407.  In short, IntelCap walked away from its duties under the Agreement.  It did so almost five months before it had a contractual right to terminate the Agreement.

It makes no difference that "Mr. Sofyer continued to periodically confer and discuss with ICP potential financing opportunities that ICP and Mizuho could work on together."  Compl., ¶34.  The Agreement did not contemplate a joint venture between ICP, IntelCap and Mizuho.  In this respect, this case is clearly analogous to *Roberts*, where the Second Circuit held that a purchaser's refusal to perform according to "the only contract he could show existed" precluded him from asserting a claim for breach of contract against the sellers.  *See Roberts*, 251 F.3d at 408.  It did not matter that the purchaser was willing to perform under a different set of terms.

The same rationale is applicable here.  IntelCap did not perform as it was obligated to do when it agreed "to assist the Company with business development outside of the United States of America in the origination of assets on which structured finance techniques can be applied" until, at least, December 31, 2007. Compl., Ex. A.  Because IntelCap failed to perform as required under the Agreement, it cannot state a claim for breach of contract against ICP.  Thus, this claim should be dismissed.

### 2. IntelCap's Repudiation of the Agreement Constitutes a Material Breach, Which Relieves ICP of Any Obligations under the Agreement

IntelCap alleges that ICP breached the Agreement by failing "to remit payment to IntelCap in accordance with the fee sharing provision in the Agreement for the transaction with Blue Marine." Compl., ¶44. Again, IntelCap fails to acknowledge that, by its own allegations, it repudiated the Agreement on August 8, 2007. This excuses ICP from its obligations to perform under Section 2(b) of the Agreement.

A repudiation consists of either "a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach" or "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463, 705 N.E.2d 656 (1998) (citing Restatement (Second) of Contracts §250 (1981)). In other words, repudiation occurs when a party "voluntarily disables itself from complying" with its contractual obligations. *Goodman Mfg. Co. L.P. v. Raytheon Co.*, 1999 WL 681382, *6 (S.D.N.Y. 1999).

Repudiation is tantamount to a breach of contract. In addition to being an excuse for nonperformance of contractual obligations, repudiation "entitles the nondefaulting party to walk away from the contract without liability." 13 Williston on Contracts § 39:38 (4th ed.); *see also Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 77, 747 N.Y.S.2d 468 (1st Dep't 2002) (explaining that "a repudiation discharges the nonrepudiating party's obligations to render performance in the future"); *In re Food Management Group, LLC*, 372 B.R. at 190-91 ("Anticipatory repudiation by one party precludes fulfillment of the contract by both sides and, therefore, excuses performance by the counterparty."). Moreover, following repudiation, the nonrepudiating party is relieved of any obligation to prove its ability to perform the contract. *Id*. at 191, 194 (repudiating party cannot evade consequences of breach by asking a court to speculate that the nonrepudiating party could not have performed in the absence of breach).

Here, Mr. Soyfer signed an Agreement with ICP that had specific requirements regarding the term and termination of the Agreement. Compl., Ex. A, ¶3. Yet, in his

statement to ICP on August 8, 2007, Mr. Soyfer did not in any way purport to "terminate" the Agreement pursuant to the termination provision provided therein. He neither used the word "termination" nor referred to Section 3 of the Agreement. He simply abandoned his responsibilities to ICP in breach of the Agreement, <u>including its term provision</u>.

Indeed, the simple act of entering into the agreement with Mizuho in and of itself was sufficient to establish repudiation. By IntelCap's own admission, that voluntary act disabled IntelCap from performing under the Agreement. *See, e.g., Computer Possibilities Unlimited*, 301 A.D.2d 70 (finding no breach of contract where plaintiff repudiated the parties' agreement by entering into a separate agreement with a third party that prevented plaintiff from performing under its agreement with defendant); *accord Goodman*, 1999 WL 681382, *8 ("Repudiation by words … has the same legal effect as … repudiation by conduct.").

The facts in the case at hand are strikingly similar to the case of *Computer Possibilities Unlimited*. Computer Possibilities Unlimited ("CPU") entered into a contract (the "Endorsement Agreement") under which it agreed to offer its product to Mobil Oil Corporation's ("Mobil") franchisees. The parties agreed that CPU would offer the product at prices below certain contractual amounts. Less than one year later, CPU entered into a separate agreement with a third party MicroSource Technologies, Inc. ("MicroSource"). Under this agreement (the "MicroSource Agreement"), MicroSource – not CPU – was given full control over the pricing of CPU's product. There was no exception that required MicroSource to adhere to the pricing structure set forth in the Endorsement Agreement.

CPU made several overtures to Mobil after it entered into the MicroSource Agreement proposing to renegotiate the Endorsement Agreement. *See Computer Possibilities Unlimited*, 301 A.D.2d at 74-75. After Mobil refused, CPU sued Mobil alleging that it had breached the Endorsement Agreement. In response, Mobil argued that it was not liable for breach because CPU repudiated the Endorsement Agreement by entering into the MicroSource Agreement. The court agreed with Mobil and found, in part, as follows:

> CPU, the party that repudiated the Endorsement Agreement by entering into the MicroSource Agreement, now seeks to enforce the same contract it repudiated by suing Mobil for

>             its subsequent termination of that contract. Given that CPU
>             repudiated the Endorsement Agreement in October 1991,
>             the execution of the MicroSource Agreement immediately
>             discharged all of Mobil's obligations under the
>             Endorsement Agreement…. Therefore, as a matter of law,
>             nothing Mobil did after the execution of the MicroSource
>             Agreement-including its termination of the Endorsement
>             Agreement in March 1992-is actionable as a breach of
>             contract.

*Id*. at 79.

The same applies here. IntelCap decided to pursue a more lucrative opportunity with Mizuho. That act, as well as Mr. Soyfer's statement that IntelCap was "not able" to perform under the Agreement disabled IntelCap from performing under the Agreement. As a result, ICP's obligations under the Agreement, including any obligation to abide by the fee sharing provision, were discharged.

The fact that there is a survival clause governing Section 2(b) does not alter this conclusion. This provision refers only to "termination" as that term is used in Section 3 of the Agreement. *See* Compl., Ex. A, ¶11. The Agreement, however, did not "terminate" under Section 3. Rather, IntelCap breached the Agreement. There is a significant difference between termination and breach. *See, e.g., Bradford v. Sonet*, 64 N.Y.S.2d 876, 877 (N.Y. Sup. Ct. 1946) (acknowledging difference between breach of contract and termination as authorized by contract); *E.R. Squibb & Sons v. Ira J. Shapiro, Inc.*, 64 N.Y.S.2d 368, 370 (N.Y. Sup. Ct. 1945) ("If the defendants had induced a 'breach' of contract, as contradistinguished from merely inducing a 'termination,' as expressly authorized by the contract, a different situation would be present.").

This is especially true in this case where, if there was no difference between contract and breach, the term provision would be rendered meaningless. *See, e.g., UMG Recordings, Inc. v. Fubu Records, LLC*, 34 A.D.3d 293, 294, 824 N.Y.S.2d 83 (1st Dep't 2006) (dismissing complaint where plaintiff's interpretation of the agreement would have rendered terms therein meaningless); *150 Broadway N.Y. Associates, L.P. v. Bodner*, 14 A.D.3d 1, 784 N.Y.S.2d 63, 66 (1st Dep't 2004) ("A cardinal rule of contract construction is that a court should 'avoid an interpretation that would leave contractual clauses

meaningless' or, stated otherwise, a contract must be interpreted 'so as to give meaning to all of its terms.'").

If there is no difference between breach and termination, the term provision has no meaning. IntelCap could have walked away a month, a week, or even a day after entering into the Agreement despite being contractually bound to the Agreement until the end of 2007. Any construction of the contract that would result in this interpretation should be avoided. *See Excel Graphics Technologies, Inc. v. CFG/AGSCB 75 Ninth Avenue, LLC*, 1 A.D.3d 65, 70, 767 N.Y.S.2d 99 (1st Dep't 2003) (holding that the trial court "erred in disregarding the clear, unambiguous terms of this negotiated lease; its determination 'effectively render[ed] meaningless a part of the contract'"). While Section 2(b) may have survived in the ordinary course, it certainly cannot survive IntelCap's wrongful breach.[3]

Indeed, Mr. Soyfer who had a copy of the Agreement and was the person responsible for negotiating the Agreement on behalf of IntelCap, in his statement to ICP on August 8, 2007 did not make the slightest attempt to terminate the Agreement. Instead, he boldly stated that IntelCap was "not able" to continue performing under the Agreement. For IntelCap to claim the "termination clause" applies would contradict Mr. Soyfer own undisputed actions as alleged in the Complaint.

### 3. Because IntelCap Has Not Properly Alleged Breach of Contract, It Is Not Entitled to Declaratory Relief

IntelCap asks this Court to issue a declaratory judgment with respect to the enforceability of Sections 2(a) and 6 of the Agreement. Compl., ¶¶60, 64. "A prayer for declaratory relief may properly be addressed by this court only if 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *LILCO v. County of Suffolk*, 604 F. Supp. 759, 762 (E.D.N.Y. 1985) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330 (1975)).

---

[3] Any other interpretation is unwarranted under these circumstances where the contract is unambiguously clear – the contract does not provide that any of its terms survive breach. *Excel Graphics Technologies*, 1 A.D.3d at 69 ("A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."). Moreover, there is a miscellaneous provision, which states as follows: "This Agreement embodies the entire understanding between the parties and supercedes and replaces any and all prior understandings, arrangements and agreements whether or written relating to its subject matter." Compl., ¶14.

Here, without a well-pleaded claim for breach of contract, there is no ripe controversy concerning interpretation of the Agreement. By the same token, any resolution of the breach of contract claim will necessarily resolve the issues raised by IntelCap's claims for a declaratory judgment. Because a breach of contract claim does not exist, the declaratory judgment claim is unripe.

**4. No Fiduciary Relationship between IntelCap and ICP Precludes an Accounting**

In count two of the Complaint, IntelCap seeks an accounting "for all fees generated" by the Blue Marine transaction because, according to IntelCap, under the Agreement, "IntelCap is entitled to share in the fees generated by this transaction." Compl., ¶¶47-48. Such allegations are patently insufficient to state a claim for an accounting because IntelCap does not and cannot allege the existence of a fiduciary relationship.

It is beyond question that under New York law, in the absence of a fiduciary relationship, an action in equity for an accounting cannot be maintained. *See, e.g., Sayer v. Wilstrop*, 200 A.D. 364, 371, 193 N.Y.S. 4 (3rd Dep't 1922) (Hinman, J., concurring) (finding "no right to an accounting" because "there was no fiduciary relationship out of which the right to an accounting might grow"); *Lemnos Broad Silk Works, Inc. v. Spiegelberg*, 127 Misc. 855, 859-60, 217 N.Y.S. 595 (Sup. Ct. 1926) (holding that without a fiduciary relationship, equitable action for an accounting was improper).

A fiduciary relationship arises "in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Millennium Expressions, Inc. v. Chauss Marketing, Ltd.*, 2007 WL 950070, *10 (S.D.N.Y. Mar. 30, 2007) (holding that the existence of a fiduciary relationship is required in order to establish a right to an accounting). Such relationships may exist in the traditional sense (*i.e.*, attorney-client) or "between close friends or even where confidence is based upon prior business dealings." *Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900 (2d Dep't 1976). To the contrary, "an arm's-length business relationship does not give rise to a fiduciary obligation." *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 529, 724 N.Y.S.2d 66 (2d Dep't 2001). Nor does a "purely commercial" relationship give rise to a fiduciary

relationship. *S.O. Textiles Co., Inc. v. A&E Products Group*, 18 F. Supp. 2d 232, 241-42 (E.D.N.Y. 1998).

Here, ICP and IntelCap had a textbook "arms-length" and "purely commercial" business relationship. There is no indication that these parties shared a traditional fiduciary relationship. Nor does the Complaint allege that the parties were close friends or had prior business dealings such that confidence had been reposed in, and betrayed by, ICP. Rather, ICP and IntelCap were two sophisticated business entities.

Tellingly, the Complaint does not even attempt to allege that a fiduciary relationship existed between ICP and IntelCap. Even if it did, the only support for such an allegation is that the parties purportedly shared clients and information about those clients. Compl., ¶43. Such support is inadequate to establish a fiduciary relationship. *See id.* (rejecting plaintiff's argument that "the sharing of customers, the providing of confidential information by Plaintiff to Defendants, and the common ground of both Plaintiff and Defendants" was adequate to create a "special relationship").

Thus, even construing the allegations of the Complaint most favorably to IntelCap, it did not share a fiduciary relationship with ICP. As a result, IntelCap is not entitled to an accounting. This claim should be dismissed.

### 5. Claims for Unjust Enrichment and Quantum Meruit Are Duplicative and Should Be Dismissed

IntelCap asserts a claim for unjust enrichment and a claim for quantum meruit, which are both based on ICP's refusal to share the fee earned in connection with the Blue Marine transaction. Compl., ¶¶49-57. These claims are both duplicative and without merit.

Under New York law, claims for unjust enrichment and quantum meruit are not separate causes of action and, therefore, they are analyzed "together as a single quasi contract claim." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). In order to recover for either claim, a plaintiff must allege the following four elements: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Id.*; *see also Atla-Medine v. Compton Corp.*, 2001 WL 170666, *8 (S.D.N.Y. Feb. 21, 2001).

IntelCap cannot recover based upon the theory of unjust enrichment for the same reason it cannot recover for breach of contract; it did not perform under the Agreement. IntelCap alleges that it abandoned the Agreement to pursue another business opportunity on August 8, 2007. Even if it did render services to ICP prior to August 8, 2007, the Complaint alleges that IntelCap received a pro-rated consulting fee in the amount of $200,000 on a bi-weekly basis. *Id*., Ex. A, ¶2(a). Thus, IntelCap cannot allege that it rendered services for which it was not compensated.

Furthermore, this claim fails because IntelCap does not allege the reasonable value of its services. To the contrary, counts three and four of the Complaint are indistinguishable from IntelCap's breach of contract claim. Such pleading is woefully deficient. As a matter of law, where a plaintiff merely restates its contractual damages as the reasonable value of its services, its unjust enrichment claim should be dismissed. *See, e.g., Fallon v. McKeon*, 230 A.D.2d 629, 630, 646 N.Y.S.2d 109 (1st Dep't 1996); *Bauman Assocs. v. H&M International Transport, Inc.*, 171 A.D.2d 479, 483-84, 567 N.Y.S.2d 404 (1st Dep't 1991).

Accordingly, IntelCap has not stated a claim for quantum meruit or unjust enrichment. The Court should dismiss counts three and four of the Complaint.

## **CONCLUSION**

For the foregoing reasons, ICP respectfully submits that the Complaint should be dismissed with prejudice pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6), and that leave to amend should be denied.

Dated: March 6, 2009

Respectfully submitted,

__/s/   Christopher J. Clark_____

Christopher J. Clark
Angela M. Papalaskaris
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Email: cjclark@dl.com
Email: apapalaskaris@dl.com

*Attorneys for Defendant*
*Institutional Credit Partners LLC*