UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

INTELLECTUAL CAPITAL PARTNER,

          Plaintiff,

    -against-

                              Index No.: 08-CV-10580 (DC)

INSTITUTIONAL CREDIT PARTNERS LLC,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**CROSBY & HIGGINS LLP**
Todd A. Higgins, Esq.
Carolyn A. Klos, Esq.
350 Broadway, Suite 300
New York, NY 10013
Tel: (646) 452-2300
Fax: (646) 452-2301

*Attorneys for Plaintiff*
*Intellectual Capital Partner*

April 2, 2009

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................ii

Introduction ..........................................................................................................................1

Factual Background ..............................................................................................................2

Argument ..............................................................................................................................7

I.     THE COMPLAINT PROPERLY ALLEGES A CLAIM FOR BREACH
       OF CONTRACT..........................................................................................................8

II.    THE    COMPLAINT    PROPER    ALLEGES    CLAIMS    FOR
       DECLARATORY RELIEF .........................................................................................16

III.   THE   COMPLAINT   PROPERLY   ALLEGES   A   CLAIM   FOR   AN
       ACCOUNTING............................................................................................................18

IV.    THE COMPLAINT PROPERLY ALLEGES CLAIMS FOR UNJUST
       ENRICHMENT AND QUANTUM MERUIT............................................................20

Conclusion ...........................................................................................................................23

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544, 127 S. Ct. 1955 (2007)........................................................................8


**United States Court of Appeals Cases**

Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,
    418 F.3d 168 (2d Cir. 2005)..................................................................................21


**United States District Court Cases**

Benevento v. RJR Nabisco, Inc.,
    No. 89 Civ. 6266, 1993 WL 126424 (S.D.N.Y. Apr. 1, 1993)........................21, 22

Brooklyn Hosp. Center v. Westport Ins. Corp.,
    No. 03 Civ. 5190, 2004 WL 868208 (S.D.N.Y. Apr. 21, 2004)............................18

CSC Recovery Corp. v. Daido Steel Co., Ltd.,
    No. 94 Civ. 9214, 2000 WL 134578 (S.D.N.Y. Feb. 4, 2000)..............................16

Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,
    261 F. Supp.2d 293 (S.D.N.Y. 2003)...............................................................16, 18

Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.,
    662 F. Supp. 798 (S.D.N.Y. 1987) .......................................................................12

Goodman Manufacturing Co. v. Raytheon Company,
    No. 98 Civ. 2774, 1999 WL 681382 (S.D.N.Y. Aug. 31, 1999) .......................7, 11

In re Food Management Group, LLC,
    372 B.R. 171 (Bkrtcy. S.D.N.Y. 2007)............................................................12, 13

In re Vivendi Universal, S.A.,
    No. 02 Civ. 5571, 03 Civ. 2175, 2004 WL 876050 (S.D.N.Y. Apr. 22, 2004).....20

J.C. Penney Corp., Inc. v. Carousel Center Co.,
    No. 5:04-CV-1356, 2008 WL 2704916 (N.D.N.Y. July 8, 2008) .........................16

Labajo v. Best Buy Stores, L.P.,
    478 F. Supp. 2d 523 (S.D.N.Y. 2007)...................................................................20

Lucente v. International Business Machines Corp.,
    146 F. Supp. 2d 298 (S.D.N.Y. 2001)..............................................................12, 13

New Paradigm Software Corp. v. New Era of Networks, Inc.,
   107 F. Supp. 2d 325 (S.D.N.Y. 2000)........................................................................21

Pedre Co. v. Robins,
   901 F. Supp. 660 (S.D.N.Y.1995) ...........................................................................16

R.H. Damon & Co., Inc. v. Softkey Software Products, Inc.,
   811 F. Supp. 986 (S.D.N.Y. 1993)...........................................................................8

Rodgers v. Roulette Records, Inc.,
   677 F. Supp. 731 (S.D.N.Y. 1988) .........................................................................20

Silver Air v. Aeronautic Development Corp. Ltd.,
   656 F. Supp. 170 (S.D.N.Y. 1987)...........................................................................12

S.O. Textiles Co., Inc. v. A&E Products Group,
   18 F. Supp. 2d 232 (E.D.N.Y. 1998) .......................................................................20

Van Brunt v. Rauschenberg,
   799 F. Supp. 1467 (S.D.N.Y. 1992)..........................................................................21

Wechsler v. Hunt Health Systems, Ltd.,
   330 F. Supp. 2d 383 (S.D.N.Y. 2004)......................................................................15

## State Court Cases

Hadden v. Consolidated Edison Co. of New York, Inc.,
   34 N.Y.2d 88, 312 N.E.2d 445 (N.Y. 1974)............................................................16

Loheac v. Children's Corner Learning Center,
   51 A.D.3d 476, 857 N.Y.S.2d 143 (1st Dep't 2008) ...............................................21

Lovasz v. Fowler,
   211 A.D. 860, 207 N.Y.S. 871 (2d Dep't 1924)......................................................12

May v. Hettrick Brothers Co.,
   181 App. Div. 3, 167 N.Y.S. 966 (1st Dep't 1917) .................................................19

New Yorkers Producing Corp. v. Moss,
   237 A.D. 567, 262 N.Y.S. 113 (1st Dep't 1933) .....................................................18

North Country Rocky Point, Inc. v. Lewyt-Patchogue Co.,
   60 A.D.2d 866, 401 N.Y.S.2d 258 (2d Dep't 1978)................................................13

Ripley v. International Rys. of Central America,
    8 N.Y.2d 430, 171 N.E.2d 443 (1960).....................................................................13

Schantz v. Oakman,
    163 N.Y. 148, 57 N.E. 288 (N.Y. 1900).................................................................18

WIT Holding Corp. v. Klein,
    282 A.D.2d 527, 724 N.Y.S.2d 66 (2d Dep't 2001).............................................18

## Statutes and Rules

Federal Rule of Civil Procedure 12(b)(6) ........................................................................1, 7

## Secondary Sources

23 Williston on Contracts § 63:15 (4th ed. 2008)................................................................14

## INTRODUCTION

Plaintiff Intellectual Capital Partner ("IntelCap") respectfully submits this memorandum of law in opposition to Defendant Institutional Credit Partners LLC ("ICP")'s motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As set forth below, ICP's motion should be denied because the allegations in the Complaint are well-pled and state a claim for breach of contract, accounting, unjust enrichment, quantum meruit and declaratory relief. Indeed, ICP's motion practice boils down to nothing more than an improper attempt to rewrite a single allegation in the Complaint and parlay it into a fictional set of facts clearly not pled by IntelCap and plainly contradicted by the allegations actually set forth in the Complaint. Without question, IntelCap alleges that it performed its contractual obligations and no amount of recasting by ICP can alter the fact that IntelCap has therefore properly alleged all of the claims for which it is seeking relief.

At best, ICP's motion succeeds only in raising fact questions concerning *the defenses* it may plead when it finally answers the Complaint. Admittedly, the existence of these "fact questions" might preclude the Court from dismissing ICP's defenses as a matter of law if it pleads them. That said, IntelCap's Complaint is not only well-pled; it also indicates the existence of documentary evidence that ICP undoubtedly possesses and that IntelCap believes will ultimately render the factual contentions underpinning ICP's defenses untenable. For now however, the Court need not look beyond the allegations in the Complaint or consider any of the factual issues that ICP has improperly raised in its motion. With respect to each and every claim alleged, IntelCap has carefully pled all of the required elements and has nowhere alleged in its Complaint a single fact which could somehow be construed, *as a matter of law*, as negating an

1

otherwise well-pled element of any of those claims. Accordingly, ICP's motion to dismiss the Complaint should be denied.

## **FACTUAL BACKGROUND**

The facts relating to this action are set forth in detail in IntelCap's Complaint and are summarized here for the Court's convenience. As set forth in the Complaint, IntelCap was started in 2004 by its managing partner and sole owner, Yves Soyfer, with the sponsorship of Deutsche Bank. Complaint[1] at ¶ 15. IntelCap's purpose was to facilitate the origination of certain credit transactions in emerging markets, including Latin America. Id. Over time, IntelCap's efforts to do so in Mexico resulted in a proprietary network of advisers that provided access to key relationships and thus to deals originating in that market. Id. In particular, by 2005, IntelCap was working with the ex-Economy Minister of Mexico, Mr. Jesus Reyes Heroles. Id. at ¶ 16. Mr. Reyes Heroles facilitated key introductions for IntelCap in Mexico, and helped IntelCap to cultivate the undiscovered opportunity of focusing on arranging structured financing deals for contractors providing services to Mexico's state-owned petroleum company Petróleos Mexicanos ("PEMEX"). Id. PEMEX is a decentralized public entity of the Mexican Government and the sole provider of oil products in Mexico, as well as the largest company in Mexico. Id. at ¶ 17.

A few months after IntelCap started to work with Mr. Reyes Heroles, he was appointed as the Chief Executive Officer of PEMEX. Id. at ¶ 18. One of the PEMEX contractors IntelCap began working with during this time period was a Mexican PEMEX shipping contractor named Blue Marine Technology, S.A. de C.V. ("Blue Marine"). Id. at ¶ 19. Blue Marine possessed immediate structured financing needs for the acquisition of vessels working with PEMEX on

---

[1] Complaint filed by IntelCap on December 5, 2008 and attached as Exhibit A to the Affirmation of Angela M. Papalaskaris submitted in support of Defendant's Motion to Dismiss the Complaint.

contracts awarded previously; thus, IntelCap immediately began working on securing the financing for this, as well as for a number of other transactions. Id.

Originally, Deutsche Bank handled the majority of the financing for IntelCap. Id. at ¶ 20. However, at the end of 2006, IntelCap began looking for another complimentary firm to provide additional support for structured financing, while IntelCap in turn continued developing relationships and originating new deals. Id. As a result, in or about November 2006, IntelCap reached out to Tom Priore at ICP, among others, in order to evaluate potential partners for IntelCap to work with in exploiting the emerging business opportunities that IntelCap identified in Mexico. Id. at ¶ 21. Mr. Priore had previously expressed an interest in working together with IntelCap, and did so again in this instance, and in January 2007, the parties entered into a consulting and fee-sharing agreement (the "Agreement"), which was to commence on February 12, 2007. Id. at ¶ 22.

Under the terms of the Agreement, IntelCap agreed to assist ICP in business development outside of the United States of America in the origination of assets on which structured financing techniques could be applied. Id. In return, ICP was obligated to pay IntelCap an annual consulting fee, which was to be paid on a pro-rated monthly basis, as well as to share in any fees generated as a result of the relationships brought to ICP by IntelCap. Id. Specifically, paragraph 2(b) of the Agreement provides that "[t]here will be a fee-sharing arrangement between the Company and the Consultant for each deal brought to the Company by the Consultant, as presented in Appendix A of this document." Id. at ¶ 23. Appendix A to the Agreement in turn sets forth the fee allocation to be paid to IntelCap based on the size of the transaction ICP closes. Id. Additionally, paragraph 11 of the Agreement expressly states that section 2(b) survives the termination of the Agreement. Specifically, paragraph 11, entitled "Surviving Sections," states

3

that sections 2(b) ("Payments; Expenses"), 4 ("No Promotion"), 5 ("Confidentiality"), and 12

("Notices") survive the termination of the Agreement. Id. at ¶ 35.

From the outset of the parties' relationship, IntelCap was concerned about protecting the

valuable client and contact list it had accumulated. Id. at ¶ 28. Accordingly, shortly after

entering into the Agreement, in or about April 2007, the parties agreed to modify the Agreement

and insert an additional section regarding non-solicitation. Id. at ¶ 29. Specifically, paragraph 6

of the Agreement states:

> While the Consultant is performing services for the Company in accordance
> with this Agreement and for a period of three years after **any** termination of
> this Agreement, both the Consultant and the Client will not solicit business or
> perform work for the clients of the other party (i.e. the Company will not
> solicit business or perform work for the Consultant's clients and the
> Consultant will not solicit business or perform work for the Company's
> clients), either directly or indirectly, or participate or assist any other entity, in
> any way, in any other entity's solicitation of business from or performance of
> work for each of the Consultant's or Company's respective clients. The list of
> the Consultant's clients is presented in Exhibit B of this Agreement. The
> Consultant may add clients to the list in Exhibit B with the approval of the
> Company whose approval should not be unreasonably withheld. (Emphasis
> added).

Id. Appendix B of the Agreement in turn listed seven individually identified clients of IntelCap,

including Blue Marine, for which ICP expressly agreed to refrain from soliciting business or

performing any work during the term of the Agreement and for three years following any

termination, except, obviously, to the extent such work was to be performed with IntelCap's

consent in accordance with the fee-sharing provision. Id. at ¶ 30. By its own terms, paragraph 6

regarding "Non Solicitation of Clients" was to survive "any termination" of the Agreement for a

period of three years. Id. at ¶ 35.

Thereafter, IntelCap performed all of its obligations under the Agreement, providing ICP

with insight on the Mexican market, access to IntelCap's exclusive contacts, and information

4

regarding PEMEX contracts, as well connecting ICP with IntelCap's clients and PEMEX contractors, including Blue Marine. Id. at ¶ 24. Given Blue Marine's immediate need for structured financing models for a number of transactions related to PEMEX contracts, IntelCap and ICP immediately began working together on these financing needs for Blue Marine, as well as for a number of other exclusive clients of IntelCap. Id. at ¶¶ 24-25. Shortly thereafter, ICP and Blue Marine entered into an engagement letter in March 2007, which expressly stated that ICP and Blue Marine had been introduced by IntelCap. Id. at ¶ 25.

ICP and IntelCap worked with Blue Marine to develop structured financing options on a wide variety of potential PEMEX transactions, including a deal that involved a five product tanker tender that would satisfy the requirements of an upcoming PEMEX tender that was initially expected to be announced in April 2007, and which called for staggered vessel deliveries commencing in September 2007 (PEMEX Tender No. 18576018-022-07). Id. at ¶¶ 25-26. Consistent with this effort, IntelCap, Blue Marine and ICP worked on identifying the proper vessels to meet the strict pre-requirements of the tender and worked on arranging the necessary financing for the tender. Id. at ¶ 27. Despite continued delays in the granting of the contracts by PEMEX, which continued until December 2007 when the official notification of the tender was made, the parties continued working on this, as well as a number of other transactions throughout the rest of 2007. Id.

Upon execution of the Agreement, ICP paid IntelCap in accordance with the payment terms related to the consulting fee without complaint, and IntelCap performed its obligations under the Agreement. Id. In August 2007, however, Mr. Soyfer, IntelCap's managing partner, agreed to create and co-manage a new principal investment group with Mizuho International ("Mizuho"). Id. at ¶ 32. As a result, on August 8, 2007, Mr. Soyfer advised ICP of this

development and indicated that Intelcap would not be able to continue working with ICP in the same capacity in the future, but that he nonetheless looked forward to continuing the relationship. Id.

Thereafter, throughout Summer and Fall 2007, Mr. Soyfer continued to confer with ICP regarding potential financing opportunities that ICP and IntelCap or Mizuho could work on, including with respect to PEMEX contracts. Id. at ¶¶ 33-34. ICP, however, subsequently discontinued paying IntelCap a monthly consulting fee. Id. at ¶ 33. At one point in the parties' discussions, ICP advised that it would be willing to enter into a new agreement and partner with Mizuho on future opportunities if IntelCap released ICP from its obligations under the Agreement. Id. at ¶ 34. IntelCap declined to do so, however and reminded ICP of its continuing non-solicit obligations pursuant to the express terms of the Agreement, which specifically identified IntelCap's exclusive clients and expressly prohibited ICP from soliciting or independently performing work for them. Id. at ¶ 33. As set forth in the Complaint, the Agreement terminated at the latest on December 31, 2007, when neither party extended it in accordance with paragraph 3 of the Agreement. Id. at ¶ 34.

In May 2008, an announcement was made that ICP was arranging financing with Blue Marine as part of the tenders that Blue Marine had won to lease the vessels African Future and Wabash, part of the same five product tanker PEMEX tender (PEMEX Tender No. 18576018-022-07) that ICP, IntelCap and Blue Marine had been working on since early 2007. Id. at ¶¶ 36-37. Subsequently, IntelCap learned from media reports that the transaction involving ICP and Blue Marine closed. Id. at ¶ 37. Specifically, on October 14, 2008, it was reported that ICP successfully "structured and arranged a $121 million financing package" for Blue Marine "for the acquisition of two ships to be leased to [PEMEX] . . . for 10 years with purchase option at the

6

end of the lease." Id. The press release also suggested that ICP expects additional PEMEX transactions with Blue Marine in the coming months. Id. at ¶ 38.

Upon learning of the closing of the transaction, IntelCap sent a letter to ICP requesting that documentation reflecting the terms of the final transaction arranged by ICP with Blue Marine and reflecting all fees generated directly or indirectly by ICP in connection therewith, be provided to IntelCap so that the fee share owed to IntelCap could be calculated and the required payment made by ICP. Id. at ¶ 39. Again, ICP was reminded of its continuing obligations to refrain from soliciting or doing any business for Blue Marine or any of IntelCap's exclusive clients listed in Appendix B of the Agreement, except in accordance with the fee share provision provided for in the Agreement. Id. Since this time ICP has repeatedly refused to provide documentation about the transaction or remit payment in accordance with the terms of the Agreement. Id. at ¶ 40. As a result, on December 5, 2008, IntelCap commenced the instant action.

## ARGUMENT

The legal standard on a motion to dismiss is well-established and not seriously disputed by the parties. As ICP must concede, when deciding a Rule 12(b)(6) motion to dismiss, the Court is required to "view the complaint in the light most favorable to the plaintiffs. . . accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiffs." Goodman Manufacturing Co. v. Raytheon Company, No. 98 Civ. 2774, 1999 WL 681382, at *4 (S.D.N.Y. Aug. 31, 1999) (citations omitted). In other words, "[a] motion to dismiss can only be granted if it appears *beyond doubt* that the nonmoving party can prove no set of facts in support of its claims which would entitle it to relief." Id. (emphasis added). Thus, "the issue is not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled

7

to offer evidence to support the claims." Id. Here, the Complaint clearly rises "above the speculative level" and alleges facts in more than sufficient detail to meet the pleading standard for all of the claims pled, and in fact also provides documentary evidence that supports the factual allegations made. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007). As a result, ICP's motion to dismiss should be summarily denied.

## I.  THE COMPLAINT PROPERLY ALLEGES A CLAIM FOR BREACH OF CONTRACT

As an initial matter, IntelCap has properly pled a claim for breach of contract based on ICP's refusal to comply with the fee-sharing provision of the Agreement. There is little dispute that to "state a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages resulting from the breach." R.H. Damon & Co., Inc. v. Softkey Software Products, Inc., 811 F. Supp. 986, 990-991 (S.D.N.Y. 1993) (citations omitted). The Complaint plainly alleges each of these elements. First, the Complaint clearly alleges the existence of a valid and enforceable agreement between the parties and attaches a duly executed copy of the Agreement as an exhibit to the filing. Thus, there can be no real question that IntelCap and ICP entered into a valid and enforceable contract, and ICP does not suggest otherwise in its motion.

Second, the Complaint alleges in great detail that IntelCap performed its obligations under the Agreement, including by providing ICP with insight on the Mexican market, access to IntelCap's exclusive contacts, and information regarding PEMEX contracts, as well connecting ICP with IntelCap's clients and PEMEX contractors, including Blue Marine. See Complaint at ¶ 24. The Complaint specifically alleges that Blue Marine "had immediate needs for structured financing models for a number of transactions related to PEMEX contracts it had been awarded"

8

and that upon executing the Agreement, "IntelCap and ICP immediately began working together on these financing needs for Blue Marine, as well as for a number of other exclusive clients of IntelCap." Id. at ¶¶ 24-25. The Complaint also alleges that ICP and Blue Marine thereafter "entered into an engagement letter in March 2007, which expressly stated that ICP and Blue Marine had been introduced by IntelCap." Id. at ¶ 25. Moreover, the Complaint specifically identifies one of the deals that IntelCap and ICP worked on for Blue Marine as "a five product tanker tender that would satisfy the requirements of an upcoming PEMEX tender . . . which called for staggered vessel deliveries commencing in September 2007 (PEMEX Tender No. 18576018-022-07)." Id. at ¶ 26. The Complaint specifically alleges that IntelCap, Blue Marine and ICP "continued working on this, as well as a number of other transactions throughout the rest of 2007," which is precisely the contractual term set forth in the Agreement itself. Id. at ¶ 27. Given the foregoing allegations, the Complaint clearly pleads in detail that IntelCap has performed its obligations in accordance with the terms of the Agreement.

Third, the Complaint clearly alleges that in October 2008, ICP closed a transaction with Blue Marine for which IntelCap is owed a fee pursuant to the Agreement; and that ICP has thus far refused to remit the fee in accordance with the Agreement. See id. at ¶¶ 37-39. In particular, the Complaint alleges that after a year of delays with the PEMEX tender process, in May 2008, ICP announced that it "was arranging financing with Blue Marine as part of the tenders that Blue Marine had won to lease the vessels African Future and Wabash, part of the same five product tanker tender . . . that ICP, IntelCap and Blue Marine had been working on since early 2007." Id. at ¶ 36. The Complaint alleges that IntelCap thereafter requested an accounting and payment of the fees owed to it by ICP in connection with this transaction and that ICP has since refused to do so. See id. at ¶¶ 39-40. Accordingly, the Complaint alleges that ICP has breached the

9

Agreement and thus damaged IntelCap in an amount to be determined at trial but believed to be in excess of $75,000. See id. at ¶ 45.

Given the facts alleged in the Complaint, which ICP must accept as true for purposes of its motion, the Court's inquiry should end here. IntelCap has alleged the paradigmatic example of a breach of contract claim. Notwithstanding this, however, ICP now moves to dismiss IntelCap's breach of contract claim by contending that IntelCap has somehow failed to allege that it performed its obligations under the Agreement. See ICP Brief[2] at pp. 6-7. Incredibly, ICP bases this contention, and its entire Motion to Dismiss, on one single allegation in the Complaint. Specifically, the Complaint alleges that "[i]n August 2007, Mr. Soyfer, IntelCap's managing partner, received and accepted an offer to create and co-manage a new principal investment group with Mizuho International. As a result, on August 8, 2007, Mr. Soyfer informed ICP of this development and suggested that he would not be able to continue with ICP in the same capacity in the future, but that he nonetheless looked forward to continuing the relationship." Complaint at ¶ 32. According to ICP, IntelCap's Complaint is thus hopelessly defective because this single allegation conclusively establishes, *as a matter of law*, that "IntelCap concedes that it did not perform according to the terms of the Agreement," that "by its own allegations, it repudiated the Agreement on August 8, 2007," and that Mr. Soyfer "simply abandoned his responsibilities to ICP." ICP Brief at pp. 7-9.

This is complete nonsense. For one thing, nowhere does the Complaint even suggest, let alone allege, that IntelCap failed to perform its obligations under the Agreement (whether in full or in part). Nor does the Complaint anywhere allege that IntelCap repudiated the Agreement or otherwise became unable to perform its obligations because of Mr. Soyfer's involvement with

---

[2] Memorandum of Law In Support of Defendant Institutional Credit Partner LLC's Motion to Dismiss the Complaint dated March 6, 2009.

Mizuho. ICP has simply manufactured those contentions out of whole cloth to support an otherwise baseless motion. Indeed, the Complaint alleges the opposite. The Complaint expressly alleges that IntelCap, Blue Marine and ICP worked on the PEMEX tender "until December 2007 when the official notification of the tender was made" and continued working on "a number of other transactions throughout the rest of 2007." Complaint at ¶ 27. The Complaint likewise alleges that the parties continued to work together after Mr. Soyfer advised ICP of his plans with Mizuho, and thus continued to recognize and perform the parties' respective obligations under the Agreement. See id. at ¶ 34. In this regard; the Complaint even specifically alleges that ICP thereafter asked IntelCap to release it from the Agreement in exchange for ICP entering into a new agreement with Mizuho. See id. These well-pled allegations render ICP's self-serving, fictional interpretation of the facts legally untenable, especially on a motion to dismiss, where IntelCap must be afforded the benefit of every reasonable, favorable inference in construing the allegations in the Complaint. See Goodman Manufacturing Co., 1999 WL 681382, at *4.

In any event, even as a factual matter, nowhere does this allegation (or any other part of the Complaint) suggest that Mr. Soyfer was advising ICP by this communication that IntelCap was unwilling or unable to perform its obligations under the Agreement, that it did not intend to honor its obligations under the Agreement, or that it was unilaterally terminating or walking away from its obligations. Nor does this allegation state that Mr. Soyfer was restricted by the terms of the Agreement from working with Mizuho, or conversely, that Mr. Soyfer or IntelCap was prohibited by Mizuho from continuing to perform the Agreement or from establishing a new working relationship with ICP. To the contrary, while the full facts and circumstances surrounding these issues must await fact discovery, the plain language of the Agreement itself

11

makes clear that IntelCap was required to provide advance notice of its intent to terminate the Agreement prior to December 31, 2007, and at most, the allegation in the Complaint suggests that IntelCap did that. If anything, the Complaint alleges that it was ICP that attempted to terminate the Agreement in response to Mr. Soyfer's communication and that *it was ICP that subsequently failed to continue performing* the Agreement by discontinuing payment of the consulting fees even as the parties continued to work together.

For the same reason, ICP's assertion that IntelCap somehow repudiated the Agreement by virtue of Mr. Soyfer's communication fails. The law on repudiation is clear: "there must be an absolute, unequivocal repudiation of a contract by one party in order to warrant the other in treating it as at an end and in rescinding it." Lovasz v. Fowler, 211 A.D. 860, 207 N.Y.S. 871 (2d Dep't 1924). Additionally, if the alleged non-repudiating or non-breaching party considers a contract to be repudiated it has two *mutually exclusive* options of either "elect[ing] to treat the contract as terminated and exercise [its] remedies, or continue to treat the contract as valid." In re Food Management Group, LLC, 372 B.R. 171, 210 (Bkrtcy. S.D.N.Y. 2007) (emphasis added); see also Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 662 F. Supp. 798, 804-805 (S.D.N.Y. 1987). If the injured party continues to treat the contract as valid, however, he surrenders his right to terminate later based on that breach. See Filmline (Cross-Country) Productions, Inc., 662 F. Supp. at 804-805.

Additionally, "a contract that is not treated as broken continues to exist for the benefit of both parties." Lucente v. International Business Machines Corp., 146 F. Supp. 2d 298, 315 (S.D.N.Y. 2001). In fact, "if the non-repudiating party himself defaults on the contract before he elects to accept the breach, the other party has the right to act upon his default." Id. (citing Silver Air v. Aeronautic Development Corp. Ltd., 656 F. Supp. 170 (S.D.N.Y. 1987);

12

North Country Rocky Point, Inc. v. Lewyt-Patchogue Co., 60 A.D.2d 866, 401 N.Y.S.2d 258 (2d

Dep't 1978)). Finally, "[w]here a contract consists of parts so distinct and independent that each

could be performed without reference to the others, a failure of one of the parties to perform one

of the parts or terms of the contract does not authorize the other to rescind the whole contract and

refuse to accept a tender of performance of the remainder of the contract by the party in default."

Ripley v. International Rys. of Central America, 8 N.Y.2d 430, 171 N.E.2d 443 (N.Y. 1960).

Here, there is nothing to suggest that IntelCap communicated an unequivocal repudiation,

thereby justifying a unilateral termination by ICP. Nor is there an allegation that ICP ever gave

notice as required by the Agreement that it viewed IntelCap's actions as a repudiation or even

that IntelCap was in material breach of some specific obligation under the Agreement. To the

contrary, the Complaint alleges that IntelCap continued to perform, despite the fact that ICP

failed to continue making payments, and that ICP and IntelCap continued to treat the Agreement

as valid. See Complaint at ¶¶ 33-34. Indeed, the Complaint specifically alleges that the parties

continued to work together after August 8, 2007, and that IntelCap expressly asserted the validity

of the Agreement and its continuing rights with regard to the non-solicitation and fee-sharing

provisions. See id. The Complaint also alleges that ICP thereafter specifically asked IntelCap in

late 2007 for a release from its obligations under the Agreement. See id. at ¶ 34. These

allegations clearly contradict any assertion by ICP, especially at the pleading stage, that it

thought IntelCap unambiguously repudiated the Agreement. As a result, ICP cannot now choose

to treat the Agreement as repudiated simply to avoid its own obligations. See Lucente, 146 F.

Supp.2d at 315; see also In re Food Management Group, LLC, 372 B.R. at 210.

At bottom, ICP's motion papers simply foreshadow the factual issues to be resolved in

discovery relating to the various defenses that ICP apparently intends to plead when it answers

the Complaint. Specifically, ICP apparently hopes to establish that despite its failure to pay the fees owed to IntelCap in connection with the Blue Marine transaction, it has a defense to the claim because IntelCap somehow first materially breached or repudiated the Agreement in August 2007, thereby discharging ICP's obligations under the Agreement; including apparently not only the fee-sharing provision, but also ICP's unambiguous contractual promise not to solicit or independently do business with any of IntelCap's clients that were expressly identified in the Agreement, including Blue Marine, irrespective of any termination of the Agreement. Suffice to say, IntelCap strongly disputes all of ICP's factual assertions and its legal conclusions, and firmly believes that discovery will show them to be incorrect. However, those issues are to be resolved another day, and cannot be decided in the context of ICP's Motion to Dismiss. See e.g., 23 Williston on Contracts § 63:15 (4th ed. 2008) ("The issue whether a party's breach excuses future performance of the contract by the non-breaching party, as this is another way of declaring the breach material, presents a question of fact. Similarly, the question whether a party has repudiated a contract is one of fact").

Finally, even though likewise well beyond the scope of ICP's motion to dismiss, it is worth noting that even if a fact-finder ultimately were to conclude that Mr. Soyfer's August 8, 2007 communication somehow unequivocally repudiated, terminated, or otherwise materially breached the Agreement, this will not excuse ICP's obligation related to the performance already given by IntelCap. For one thing, Section 2(b) of the Agreement states: "There will be a fee-sharing arrangement between the Company and the Consultant for each deal brought to the Company by the Consultant, as presented in Appendix A of this document." See Complaint at ¶ 23. In turn, section 11 states that section 2(b) of the Agreement survives the termination of the Agreement, and says so without qualification. See id. at ¶ 35. As a result, even if proven, ICP's

14

contentions would only establish that it had a right to terminate the Agreement; however, the parties expressly agreed that the obligation to share fees "for each deal brought to the Company" "will survive the termination of this Agreement." See id. at Exhibit A. This language is not only clear and unambiguous, it is also perfectly logical because once IntelCap brings a deal to ICP, its performance is complete with respect to the fee-sharing provision, and yet ICP's performance may not happen for many months or even years, depending on how long it takes for the deal to close and fees to be paid. Similarly, and yet even more clear, is the non-solicitation clause of the Agreement, which likewise makes clear that ICP's obligations not to perform work for any of IntelCap's clients, including Blue Marine, except pursuant to the fee-sharing provision, survived "any termination" of the Agreement. See id. at ¶ 35. This plain language simply confirms the fact that this fundamental obligation not to go around the fee-sharing provision and to share in any fee generated by a deal brought by IntelCap arose at the moment that the relationship was brought to ICP by IntelCap, *survived any termination of the Agreement*, and was contingent only upon a deal closing.

Moreover, even if this survival language had not appeared in the Agreement, ICP's obligations pursuant to the fee-sharing provision still would not be excused since indisputably, IntelCap substantially performed its obligations under the Agreement. Given that IntelCap indisputably performed by disclosing to ICP numerous potential financing deals that it originated, including the $121 million financing deal that ICP closed with Blue Marine, the right to the deal fee owed to IntelCap arose prior to the events ICP alleges constituted a breach of the Agreement; and, as a result, the performance of ICP's corresponding obligation to share the deal fee was not excused and plainly survives, even if it ultimately turns out that IntelCap in fact subsequently breached the Agreement. See Wechsler v. Hunt Health Systems, Ltd., 330 F. Supp.

2d 383, 421 (S.D.N.Y. 2004) (citing Hadden v. Consolidated Edison Co. of New York, Inc., 34 N.Y.2d 88, 96, 312 N.E.2d 445 (N.Y. 1974) ("[I]t is not every breach of a constructive obligation which will excuse the other party from rendering its performance under the contract. . . . If the party in default has substantially performed, the other party's performance is not excused.")); see also CSC Recovery Corp. v. Daido Steel Co., Ltd., No. 94 Civ. 9214, 2000 WL 134578, at *6 (S.D.N.Y. Feb. 4, 2000) (using the doctrine of substantial performance to determine whether a parties rights under a contract accrued). As a result, IntelCap has properly pled a claim for breach of contract in its Complaint.

## II. THE COMPLAINT PROPERLY ALLEGES CLAIMS FOR DECLARATORY RELIEF

IntelCap has also stated a claim for declaratory relief regarding the scope and enforceability of the Agreement. Specifically, IntelCap has asked for a declaratory judgment defining the scope and continuing enforceability of paragraph 2(b) of the Agreement governing the fee-sharing relationship and paragraph 6 of the Agreement, governing the non-solicitation restriction. "[T]he standard for ripeness in a declaratory judgment action is 'whether ... there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 261 F. Supp. 2d 293, 295-296 (S.D.N.Y. 2003) (citing Pedre Co. v. Robins, 901 F. Supp. 660, 663 (S.D.N.Y.1995)). Where "one party makes a direct repudiation of another party's legal rights," a justiciable controversy exists. J.C. Penney Corp., Inc. v. Carousel Center Co., No. 5:04-CV-1356, 2008 WL 2704916, at *5-6 (N.D.N.Y. July 8, 2008).

Here, IntelCap has alleged that the Agreement was freely entered into and bargained for by both parties, creating binding rights and obligations running to both IntelCap and ICP. See Complaint at ¶¶ 59, 63. However, ICP now disputes the plain meaning of clause 2(b) of the

16

Agreement, which requires it to share all fees generated from any deals brought to ICP by IntelCap, and the fact that the clause survives the termination of the Agreement. See id. at ¶ 60. Additionally, ICP disputes the continuing enforceability of clause 6 of the Agreement, which requires ICP to refrain from soliciting business from or doing work for any of IntelCap's clients listed in Appendix B of the Agreement for a period of three years from any termination of the Agreement, unless IntelCap receives a fee pursuant to the fee-sharing provision of the Agreement. See id. at ¶ 64. As with clause 2(b), ICP also disputes that clause 6 was to survive any termination of the Agreement. See id. at ¶¶ 64-65. As a result, actual controversies of a justiciable nature exist between IntelCap and ICP regarding the scope and continuing enforceability of paragraph 2(b) of the Agreement governing the fee-sharing relationship and paragraph 6 of the Agreement governing the non-solicitation restriction.

Given that any continued treatment by ICP of these clauses as unenforceable and not applicable to deals they are working on with IntelCap's clients and/or brought to ICP by IntelCap will deprive IntelCap of the benefits it bargained for under the Agreement, the controversies to be decided by these claims are substantial and of immediate concern to IntelCap. In fact, IntelCap has alleged that the October 14, 2008, press release announcing that ICP successfully "structured and arranged a $121 million financing package" for Blue Marine also stated that ICP expects additional PEMEX transactions with Blue Marine in the coming months. See Complaint at ¶¶ 37-38. This allegation demonstrates that the controversy alleged is real and poses an immediate threat to IntelCap's rights, warranting declaratory relief concerning IntelCap's continuing right to share in the fees generated by deals brought to ICP during the course of the parties relationship, and concerning the continuing enforceability of the non-solicitation clause set forth in the Agreement.

17

ICP's contention that IntelCap's breach of contract claim is not well-pled, and as a result there is no ripe controversy concerning the interpretation of the Agreement, is incorrect as a matter of law. IntelCap obviously disputes ICP's claim that the breach of contract claim is not well-pled; however, even if that were true, "the failure of a breach of contract action for damages does not preclude a claim for declaratory judgment alleging similar facts and circumstances." Brooklyn Hosp. Center v. Westport Ins. Corp., No. 03 Civ. 5190, 2004 WL 868208, at *3-4 (S.D.N.Y. Apr. 21, 2004) (citing Duane Reade, Inc., 261 F. Supp. 2d 293). More to the point, resolution of the contract claim will not resolve all of the issues raised by the claims for declaratory relief given that the non-solicitation clause is not yet pled as a basis for the breach claim and is an independent basis of obligations between the parties, including with respect to ICP's obligations concerning Blue Marine. Given the allegations in the Complaint regarding the significant threat to IntelCap's contractually bargained for rights that ICP's current actions pose, IntelCap has properly pled claims for declaratory relief

## III.    THE COMPLAINT PROPERLY ALLEGES A CLAIM FOR AN ACCOUNTING

IntelCap has also properly pled a claim for an accounting. The law is clear that in order to sustain a suit for an accounting, the plaintiff is required to allege facts sufficient to demonstrate that "[t]here is stated a relationship 'of agency and of a trust reposed, with respect to moneys or other property received.'" New Yorkers Producing Corp. v. Moss, 237 A.D. 567, 569, 262 N.Y.S. 113, 115 (1st Dep't 1933) (quoting Schantz v. Oakman, 163 N.Y. 148, 157, 57 N.E. 288, 290 (N.Y. 1900)). However, "it is not, essential to the right to an accounting that a legal partnership exist." Id. Rather, under the circumstances described, where, such as here, the "transaction is one fiduciary in nature requiring the utmost good faith between the parties, . . . the defendant under the rules governing a fiduciary agent may be compelled to account." Id.

18

(quoting May v. Hettrick Brothers Co., 181 App. Div. 3, 13, 167 N.Y.S. 966 (1st Dep't 1917)).

In other words, "[i]f the persons stood in a mutual and confidential relation to each other, and

had a joint interest in the result of an adventure, either may demand an accounting, with a view

to ascertain the profit or loss and their respective rights." Schantz, 163 N.Y. at 157.

IntelCap alleges that ICP has received a fee that was generated from the deal which ICP

closed with Blue Marine; a relationship brought to it by IntelCap in the performance of the

Agreement. See Complaint at ¶¶ 36-40.  Now that the transaction has been completed, ICP has

collected and retained the entire fee; a share of which belongs to ICP. The relationship of trust is

apparent in the allegations and the Agreement itself, in that ICP has received the proceeds of the

business relationship in which IntelCap has an interest, and therefore, now holds property

belonging to IntelCap. See id. at Exhibit A.  The parties clearly contemplated that ICP would

collect the fee from Blue Marine and act as a custodian of it on behalf of the parties, upon the

understanding that ICP would make the proper deductions and then turn over IntelCap's

proportionate share of the fees. See id. at ¶ 37.  IntelCap has alleged that rather than doing so,

ICP has instead failed to act in good faith by misappropriating and retaining the entire fee from

the transaction for itself. See id. at ¶¶ 37-40. Therefore, due to ICP's breach of this trust

relationship, it should be made to account to IntelCap for all fees generated from the $121

million financing package it arranged for Blue Marine.

Despite ICP's characterization of the parties relationship, these were not two parties

engaging in a strictly arms-length or commercial business relationship. By way of the

relationship created by the parties through the Agreement, it was clearly one of confidence and

trust. Unlike the cases cited to by ICP in its motion papers, the relationship created was not one

of merely of a buyer and seller. See WIT Holding Corp. v. Klein, 282 A.D.2d 527, 724

19

N.Y.S.2d 66 (2d Dep't 2001) (involving an arm's length transaction involving the transfer of stock). Nor was it that of a wholesale merchant and a manufacturer. See S.O. Textiles Co., Inc. v. A&E Products Group, 18 F. Supp. 2d 232 (E.D.N.Y. 1998) (involving a purely commercial relationship regarding the manufacture and sale of garment hangers). Here, the parties were clearly working together with the ultimate goal of closing a transaction that would result in a fee to be shared between them. As alleged in the Complaint, this type of relationship, where one party is entrusted with property of the transaction, creates "special circumstances warranting equitable relief," and as a consequence, requires ICP to account to IntelCap regarding the fees generated from the financing package arranged for Blue Marine. Rodgers v. Roulette Records, Inc., 677 F. Supp. 731, 738 (S.D.N.Y. 1988) (stating that "[i]n order to establish a right to an accounting . . . plaintiff must demonstrate the existence of a fiduciary relationship . . . or other special circumstances warranting equitable relief").

## IV.   THE COMPLAINT PROPERLY ALLEGES CLAIMS FOR UNJUST ENRICHMENT AND QUANTUM MERUIT

Finally, ICP is incorrect in its assertion that IntelCap's quantum meruit and unjust enrichment claims are duplicative and should be dismissed. Given ICP's contention that the Agreement is no longer valid and enforceable, IntelCap has properly pled these equitable claims as an alternative basis for relief in order to recover the reasonable value of the benefit conferred to ICP, in the event the Agreement no longer exists. Where, as here, "there is a bona fide dispute as to the existence of a contract, a party may proceed upon a theory of unjust enrichment, and an unjust enrichment claim may be alleged alongside a breach of contract claim." Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007) (citing In re Vivendi Universal, S.A., No. 02 Civ. 5571, 03 Civ. 2175, 2004 WL 876050, at *12 (S.D.N.Y. Apr. 22, 2004)). Therefore, IntelCap is not precluded from bringing an action for breach of contract and, as

20

alternative theories of recovery, quantum meruit *and* unjust enrichment.    See Loheac v. Children's Corner Learning Center, 51 A.D.3d 476, 476, 857 N.Y.S.2d 143, 144 (1st Dep't 2008) (Emphasis added).

In order to plead unjust enrichment "a plaintiff must demonstrate that: (1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) the defendant's retention of that benefit would be unjust."    New Paradigm Software Corp. v. New Era of Networks, Inc., 107 F. Supp. 2d 325, 328-329 (S.D.N.Y. 2000) (quoting Van Brunt v. Rauschenberg, 799 F. Supp. 1467, 1472 (S.D.N.Y. 1992)).    In order to state a claim based on quantum meruit, "a claimant must allege: (1) the performance of services in good faith; (2) the acceptance of the services by whom they are rendered; (3) an expectation of compensation therefore; and (4) the reasonable value of the services."    Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005).    Although the Court may elect to treat unjust enrichment and quantum meruit claims as a whole, a plaintiff is not precluded from pleading and seeking relief under either theory. See Benevento v. RJR Nabisco, Inc., No. 89 Civ. 6266, 1993 WL 126424, at *8 (S.D.N.Y. Apr. 1, 1993).

In this case, IntelCap has pled alternative claims for both unjust enrichment and quantum meruit. In support of the claim for unjust enrichment, IntelCap has alleged that in reliance on ICP's representations that ICP would share part of the fees generated by any deals brought to it by IntelCap, IntelCap provided ICP with its proprietary information regarding the Mexican market, its knowledge of potential contracts and deals needing structured financing, and access to its exclusive clients and contacts, including Blue Marine. See Complaint at ¶¶ 50-53. Thereafter, ICP was unjustly enriched at IntelCap's expense when it closed the $121 million financing package on a deal with Blue Marine, a client brought to ICP by IntelCap, and then

21

refused to remit payment upon a demand to do so. See id. Finally, the amount in which ICP was unjustly enriched and should be made to disgorge is pled as an amount that will need to be decided by the fact-finder at trial, upon determination of what the "ill-gotten gains" ICP received were. See id.

In support of the claim for quantum meruit, Plaintiff has alleged that during its relationship with ICP, IntelCap performed a number of valuable services for ICP and provided ICP with its proprietary information and exclusive access to clients and contractors in the Mexican market, including Blue Marine, with a reasonable expectation that it would share in the fees generated by any deals that closed as a result. See id. at ¶¶ 55-57. ICP willingly accepted the benefit of IntelCap's services while knowing that IntelCap reasonably expected to share in any fee generated. See id. Yet when the deal with Blue Marine closed, ICP failed to share with IntelCap the fees generated. See id. The Complaint alleges that the reasonable value of the services that IntelCap performed for ICP is equivalent to the deal fee that it should have received for providing the deal to ICP, in an amount to be determined at trial. See id.

Despite ICP's claim that IntelCap has failed to allege the reasonable value of its services, it is perfectly appropriate for IntelCap to plead that the amount that ICP should be made to disgorge and the reasonable value of the services it rendered is equivalent to the deal fee for which IntelCap was to receive a proportionate share. A "plaintiff is entitled to recover compensation pursuant to a quantum meruit theory of recovery if [it] can demonstrate that the value of the services [it] provided . . . exceeds the amount [it] was paid pursuant to the retainer fee arrangement." Benevento, 1993 WL 126424, at *8. It is true ICP paid IntelCap a modest consulting fee until August 2007; however, the reasonable value of the services IntelCap was to perform, as contemplated by the Agreement was not simply based on the consulting fee, which

22

in fact constituted only a nominal part of the total compensation IntelCap reasonably expected to

earn. More to the point, the value of the services was inclusive of a proportionate fee of any deal

that resulted in a fee to ICP, since this was the value conferred on ICP by IntelCap's act of

originating the deal. As IntelCap alleges in the Complaint, the exact amount of the damages will

be determined at trial; however, a reasonable benchmark of the compensation owed to IntelCap

would be equivalent to a share of the fee on the Blue Marine deal origination it performed, which

ICP has subsequently retained the full value of. Accordingly, IntelCap has properly stated

claims for both unjust enrichment and quantum meruit.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Intellectual Capital Partner respectfully requests

that Defendant, Institutional Credit Partners LLC's Motion to Dismiss Plaintiff's Complaint be

denied in its entirety.


Dated:          New York, New York
                April 2, 2009


                                         CROSBY HIGGINS LLP

                                 By:     /s/ Todd A. Higgins
                                         Todd A. Higgins, Esq. (TH 7920)
                                         Carolyn A. Klos, Esq. (CK 1679)
                                         350 Broadway, Suite 300
                                         New York, NY 10013
                                         Ph: (646) 452-2300
                                         Fx: (646) 452-2301
                                         *Attorneys for Plaintiff*