UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
INTELLECTUAL CAPITAL PARTNER,

                        Plaintiff,                No. 08 Civ. 10580 (DC)

                - against -

INSTITUTIONAL CREDIT PARTNERS LLC,

                        Defendant.
------------------------------------------------------------X

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT INSTITUTIONAL CREDIT PARTNERS LLC'S MOTION TO DISMISS THE COMPLAINT

Christopher J. Clark
Angela M. Papalaskaris
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Email: cjclark@dl.com
Email: apapalaskaris@dl.com

*Attorneys for Defendant*
   *Institutional Credit Partners LLC*

Dated: April 9, 2009

ICP submits this reply memorandum of law in further support of its motion to dismiss the Complaint filed in this action by IntelCap. IntelCap's opposition to ICP's motion to dismiss does not rescue IntelCap's claims from dismissal. Among other things:

- IntelCap's entire opposition is premised upon a pleading standard that has been expressly overruled by the Supreme Court;

- IntelCap admits that performance under the Agreement required the provision of services until December 31, 2007 and attempts to gloss over the fact that IntelCap failed to perform by contending that Mr. Soyfer – as an employee of Mizuho – "worked together" with ICP from August to December 2007;

- While IntelCap focuses on whether or not its August 8, 2007 disclosure constitutes a "repudiation," it nevertheless concedes that, legally, repudiation can be achieved through an affirmative act and ignores that, by taking a position with Mizuho, Mr. Soyfer made it impossible for IntelCap to perform under the Agreement;

- IntelCap does not seriously dispute that its actions for breach of contract and declaratory judgment arise from the same agreement and same actions, making the claims redundant. If there is no breach of contract claim, there can be no declaratory judgment claims;

- While IntelCap concedes that a fiduciary relationship is required to state a claim for an accounting, it overlooks the fact that the Complaint alleges none and makes up out of whole cloth allegations of "special circumstances" and "relationships of trust" that are *not* alleged in the Complaint; and

- IntelCap disregards the controlling law by arguing that it can "benchmark" the reasonable value of its services against its alleged contractual damages to plead a *quantum meruit* claim, which under New York law it cannot do.

IntelCap criticizes ICP for raising what it deems to be factual issues in its defense and repeatedly argues that the plaintiff will disprove those facts in discovery. Opp'n Br. at 1, 13-14.[1] That is simply not the case. Not only can this matter be resolved on a motion to dismiss, it should be. Under the standard set forth in *Bell Atlantic Corp. v. Twombly*, IntelCap's formulaic allegations are an insufficient basis for subjecting ICP to

---

[1] The citation to "Opp'n Br." as used herein refers to Plaintiff's Memorandum of Law In Opposition to Defendant's Motion to Dismiss Plaintiff's Complaint, dated April 2, 2009. Unless otherwise defined herein, all other capitalized terms have the same meaning as stated in ICP's opening memorandum, dated March 6, 2009 ("ICP Br.").

1

massive, expensive and disruptive discovery. IntelCap's claims fail as a matter of law and should be dismissed.

## ARGUMENT

As a preliminary matter, IntelCap is entirely incorrect to argue that a Rule 12(b)(6) "motion to dismiss can only be granted if it appears *beyond doubt* that the nonmoving party can prove no set of facts in support of its claims which would entitle it to relief." Opp'n Br. at 7 (emphasis in original) (citing *Goodman Manufacturing Co. v. Raytheon Co.*, 1999 WL 681382, *4 (S.D.N.Y. Aug. 31, 1999)). This standard of law, which was first enunciated by the United States Supreme Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), was explicitly abrogated by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1968 (2007).

As the Supreme Court in *Twombly* held, *Conley* does not represent "the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 1969. Rather, on a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1965 (internal quotation marks omitted). The touchstone is "plausibility." *Id.* at 1966. Plaintiff's opposition fails to reveal a plausible basis for any of its claims.

### I. The Breach of Contract Claim Should Be Dismissed Because IntelCap Repudiated the Agreement and Failed to Perform

To properly state a claim for breach of a services contract, the complaint must allege due performance. *See R.H. Damon & Co., Inc. v. Softkey Software Products, Inc.*, 811 F. Supp. 986, 991 (S.D.N.Y. 1993). By the express terms of the agreement at issue here, IntelCap was required to provide services to ICP up through and until December 31, 2007. Opp'n Br. at 10-12. To establish that it satisfied this requirement, IntelCap argues that the parties continued to "work together" until that date. *Id.*, at 11 (citing Cplt. ¶ 34). That argument is flatly inconsistent with the allegations of the Complaint. The plaintiff specifically alleges that Mr. Soyfer told ICP on August 8, 2007 that IntelCap would "not be able" to continue performing under the Agreement.

The argument that Mr. Soyfer – as an employee of Mizuho and not the managing partner of IntelCap – continued to "work" with ICP after August 8th is merely an effort to obscure its own allegations. The Complaint simply does not allege that *IntelCap*

2

*rendered services under the Agreement* after August 8, 2007. Nor for that matter was it even possible for IntelCap to perform. IntelCap's argument that Mr. Soyfer's August 8, 2007 statement was merely "advance prior notice of its intent to terminate the Agreement" is undermined by the allegations in the Complaint and the terms of the Agreement. Opp'n Br. at 12. Under the terms of the Agreement, any formal termination of the Agreement had to be made by written notice to the opposing party and occur before December 31, 2007. The Complaint does not allege that Mr. Soyfer provided such notice or even attempted to comply with the Agreement in talking to ICP on August 8th. *Id.* ¶¶ 32-34. The Complaint seeks to obscure this failure by using ambivalent language regarding the time of termination: "the Agreement... terminated *at the latest* on December 31, 2007." *Id.* (emphasis added). If IntelCap had actually performed under the Agreement from August to December 2007, the Complaint would have simply alleged that the Agreement terminated *on* December 31, 2007.

Moreover, if IntelCap had performed under the Agreement between August and December 2007, it would be entitled to collect consulting fees under Section 2(a) of the Agreement. But, IntelCap does not claim that it is entitled to any consulting fees for work performed during this time period despite alleging that ICP "discontinued paying IntelCap a monthly consulting fee" after August 8th. Cplt. ¶ 33. This failure belies any notion that IntelCap can, consistent with its obligations under Rule 11, accurately allege that it performed under the Agreement after August 8, 2007.

Not only does the Complaint reveal a failure to perform under the Agreement, but it also shows repudiation.[2] While IntelCap argues that repudiation must be "absolute"

---

[2] IntelCap cites a slew of case law in an attempt to refute ICP's argument that Soyfer repudiated the Agreement (Opp'n Br. at 12-13), but fails to explain how any of these cases apply here. For example, IntelCap relies upon *In re Food Management Group, LLC*, 372 B.R. 171 (S.D.N.Y. 2007), and *Filmline (Cross-Country) Productions v. United Artists Corp.*, 662 F. Supp. 798 (S.D.N.Y. 1987), to support the point that, after repudiation, if an "injured party continues to treat the contract as valid... he surrenders his right to terminate later based on that breach." Opp'n Br. at 12. But the Complaint does not allege that ICP treated the Agreement as valid following Mr. Soyfer's repudiation on August 8th. To the contrary, it alleges that ICP discontinued payment of the consulting fee, which is inconsistent with the proposition that ICP considered the Agreement valid after August 8th. In light of IntelCap's failure to seek those fees as damages, clearly *both* parties considered the Agreement invalid after August 8th.

By the same token, IntelCap's reliance on *Ripley v. International Railways of Central America*, 8 N.Y.2d 430, 171 N.E.2d 443 (1960), does not control the outcome of this motion to dismiss. *Ripley* was a shareholders' derivative action seeking damages based on what were claimed to have been insufficient freight rates charged for the transportation of commercial goods. The parties' contractual arrangements

and "unequivocal," (Opp'n Br. at 12-13), it studiously ignores the fact that under New York law, a party need not use any specific language or phrase to effect that repudiation. Instead, repudiation may either orally be communicated *or* consist of "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463, 705 N.E.2d 656 (1998) (citing Restatement (Second) of Contracts §250 (1981)).[3]

This kind of repudiation by action was clearly evidenced in *Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 77, 747 N.Y.S.2d 468 (1st Dep't 2002), a case that ICP discussed at length in its opening brief (ICP Br. at 9-10).[4] CPU repudiated an agreement with Mobil by entering into a second agreement with MicroSource. The second agreement, like Mr. Soyfer's employment agreement with Mizuho, rendered CPU unable to perform under its earlier contract. Significantly, after entering into the agreement with MicroSource, it was "undisputed that CPU kept silent about the fact that CPU had already surrendered control over the pricing of its product by entering into the MicroSource Agreement." *Id.* at 74-75. In other words, CPU did not have to communicate a word to Mobil in order to repudiate the parties' agreement. The mere fact that it entered into the agreement with MicroSource "put it out of its power" to comply with its agreement with Mobil and was therefore sufficient to establish repudiation. *Id.* at 78.

IntelCap also fails to squarely take issue with ICP's showing that there is a significant difference between breach and termination. Opp'n Br. at 14-15. In its

---

consisted of ten purportedly separate contracts. *Id.* at 438. Thus, the issue central to its holding was the principle of divisibility (or severability). *Id.* at 437-38 ("The circumstance that they are difference documents does not necessarily mean that they do not form a single contract, but it does indicate that they are separate unless the history and subject matter shows them to be unified."). That principle is wholly absent from the allegations in this case.

[3] The allegations of the Complaint demonstrate just the kind of voluntary act that rendered IntelCap unable to perform. By accepting "an offer to create and co-manage a new principal investment group with Mizuho International," a direct competitor of ICP, Mr. Soyfer created a situation where it was impossible for IntelCap to continue honoring its obligations to ICP under the Agreement. Cplt. ¶ 32. Mr. Soyfer's "suggest[ion] that he would not be able to continue with ICP" under the Agreement expressly recognized the consequences of the situation Mr. Soyfer created. *Id.* ¶ 32. So too does the allegation that "given Mr. Soyfer's new role at Mizuho," the Agreement could not be extended. *Id.* ¶ 34.

[4] IntelCap surprisingly does not address this case at all in its opposition brief. Indeed, IntelCap fails to address any of the cases cited by ICP in support of its argument regarding repudiation.

4

opening brief, ICP demonstrated that the fee-sharing and non-solicitation provisions of the contract only survive "termination" of the Agreement, as distinct from its breach. ICP Br. at 10-11. Consequently, IntelCap's argument that that the fee-sharing and non-solicitation provisions survive "termination" of the Agreement is unresponsive to the point that these provisions do not survive a breach. Obviously, none of the provisions of the Agreement address breach.

Finally, IntelCap contends that, even if the Agreement did not contain a survival clause, "ICP's obligations pursuant to the fee-sharing provision still would not be excused" due to the doctrine of substantial performance. Opp'n Br. at 15-16. The Complaint, however, does not allege substantial performance. Plaintiff's opposition brief offers no grounds to assume substantial performance or any of the relevant factors that determine whether substantial performance has been rendered. To the contrary, IntelCap's failure to complete even half a year's worth of work under the Agreement belies any serious suggestion that it could plead substantial performance.

## II. The Claims for Declaratory Relief Should Be Dismissed

IntelCap's opposition papers largely ignore the central showing of ICP's opening brief: that a declaratory judgment claim is redundant and improper when it duplicates a claim for breach of contract.[5] Under New York law, "a cause of action for a declaratory judgment is unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract." *J.C. Penney Corp., Inc. v. Carousel Center Company, L.P.*, 2008 WL 2704916, *6 (N.D.N.Y. 2008) (quoting *Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 54 (1st Dep't)).

In *J.C. Penney*, for example, a tenant asserted *inter alia* breach of contract and declaratory judgment claims against its landlord in order to resolve a dispute about tax payments under the tenant's lease obligations. The court held that the "resolution of Plaintiff's breach-of-contact claims regarding the methods used to calculate Plaintiff's

---

[5] IntelCap argues extensively that it has satisfied the pleading requirement to state a claim for declaratory judgment. Opp'n Br. at 16-18. ICP has not and does not argue about these elements, but argues that these claims suffer from the same problems as IntelCap's breach of contract claim. ICP Br. at 12. In an attempt to distinguish its breach of contract claim from its claims for declaratory judgment, the plaintiff argues that its breach of contract claim is not based on the non-solicit provision of the Agreement (Opp'n Br. at 18). In the end, however, if ICP is correct that IntelCap's repudiation of the Agreement excuses ICP's obligations under the Agreement, none of its provisions survive. Thus, resolution of the breach of contract claim still resolves both declaratory judgment claims.

5

past escalation payments will provide binding authority for the correct methods going forward." *J.C. Penney*, 2008 WL 2704916, *6. As a result, the court dismissed the tenant's claims for declaratory judgment as "unnecessary and inappropriate in light of the fact that Plaintiff has an adequate alternative remedy in its breach-of-contract claims." *Id.*

The same outcome was reached in *Watson v. Sony Music Entertainment, Inc.*, 282 A.D.2d 222, 722 N.Y.S.2d 385 (1st Dep't 2001). There, a recording artist initiated a suit against its record company alleging improper calculation of certain royalties due to the artist. The trial court dismissed the declaratory judgment claims on the ground that the recording artist had "an adequate remedy under his cause of action for breach of contract." *Id.* at 222.; *see also Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 529 N.Y.S.2d 279 (1st Dep't 1988) (dismissing declaratory judgment claims where "plaintiffs conceded that these causes of action parallel the breach of contract claims and merely seek a declaration of rights and obligation as will be determined under the first and second causes of action.").

The same reasoning applies in this case. There are no grounds for relief under a declaratory judgment claim that are not covered by the breach of contract claim. They are identical. IntelCap's claims for declaratory relief, therefore, should be dismissed.

### III. The Claim for an Accounting Should Be Dismissed Because There Is No Fiduciary or Special Relationship between the Parties

The law is well settled that "the right to an accounting is premised upon the existence of a confidential or fiduciary relationship." *S.O. Textiles Co., Inc. v. A&E Products Group*, 18 F. Supp. 2d 232, 241-42 (E.D.N.Y. 1998). In its opposition brief, IntelCap acknowledges this requirement and spends the bulk of its argument trying to demonstrate that same kind of fiduciary relationship existed between the parties. Opp'n Br. at 18. That argument, however, is thoroughly undermined by the allegations of the Complaint, which demonstrate a contractual relationship, not a fiduciary one.

IntelCap argues that the requisite "relationship of trust" is "apparent" because of the nature of the relationship between the parties *Id.* at 19. But make no mistake; the language from plaintiff's brief (*Id.* at 20) does not appear in the Complaint, which makes

6

no mention of any such special relationship.[6] Tellingly, in its opposition brief, IntelCap does not cite any allegation of the Complaint that states the parties had an agency or fiduciary relationship or a "relationship of trust." Opp'n Br. at 18-20. Indeed, it cannot do so because there are no allegations in the Complaint to that effect.

Instead, IntelCap's pleadings demonstrate a straightforward, commercial transaction between two arms-length parties. The Complaint alleges that the parties entered into a contractual relationship that lasted approximately six months. The purpose of the parties' relationship, as defined by the Agreement, was to engage in profit-driven, commercial activities: "The Company hereby engages the Consultant to assist the Company with business development outside of the United States of America in the origination of assets on which structured financing techniques can be applied." Cplt., Ex. A, ¶ 1. These services fall within the textbook definition of a commercial relationship. *See* American Heritage Dictionary (4th ed. 2004) (defining commercial as "engaged in commerce" and "having profit as a chief aim"). This was a "commercial relationship, pure and simple." *Brasport S.A. v. Hoechst Celanese Corp.*, 747 F. Supp. 199, 202 (S.D.N.Y. 2002). This could not be any further from a fiduciary scenario.

Nor does the Complaint demonstrate any of the hallmark "imbalance of power between the parties." *Langford v. Roman Catholic Diocese of Brooklyn*, 271 A.D.2d 494, 504, 705 N.Y.S.2d 661 (2d Dep't 2000). If anything, the Complaint can only be fairly read to allege the opposite. For example, the Complaint describes IntelCap as having sophisticated knowledge of emerging markets years before it entered into the Agreement with ICP. Cplt. ¶ 15. The Complaint also alleges that IntelCap successfully persuaded ICP to modify the Agreement to insert an additional section regarding non-solicitation of each party's clients.[7] *Id.* ¶ 28.

---

[6] Moreover, IntelCap's argument that this relationship of trust is "apparent" in the Agreement itself is untenable. Opp'n Br. at 19. Section 7 of the Agreement provides otherwise, that: "[T]his Agreement is intended to create an independent contractor relationship and is not intended to create an employer-employee relationship, a partnership, joint venture, or similar relationship." Cplt., Ex. A.

[7] Not every confidential relationship or joint venture involves a "fiduciary" relationship. *See, e.g., Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 176 (S.D.N.Y. 2004) (no fiduciary relationship between manufacturer and exclusive sales agent); *Don King Productions, Inc. v. Douglas*, 742 F. Supp. 741, 769 (S.D.N.Y.1990) (generally no fiduciary relationship between boxer and promoter); *Kirkland v. American Title Insurance Co.*, 692 F. Supp. 153, 157 (E.D.N.Y.1988) (no fiduciary relationship

All that IntelCap alleges is that ICP successfully completed a commercial transaction which, under the Agreement, generated fees that IntelCap is entitled to share. Cplt. ¶¶ 46-48. But the Complaint alleges that this gives rise to a breach of contract, not a breach of fiduciary duty. Consequently, there can be no claim for an accounting. *See Millennium Expressions, Inc. v. Chauss Marketing, Ltd.*, 2007 WL 950070, *10 (S.D.N.Y. Mar. 30, 2007) ("The defendants' liability is for breach of contract, not for breach of any fiduciary duty, and a claim for accounting therefore does not lie.").

### IV. The Claims for Unjust Enrichment and Quantum Meruit Should be Dismissed

IntelCap concedes a number of points on its unjust enrichment and *quantum meruit* claims. First, the plaintiff does not dispute the fact that courts routinely treat these as a single claim. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). Second, they offer no rebuttal to ICP's showing that IntelCap must allege the reasonable value of its services. Instead, IntelCap maintains that the value of its services (without regard to reasonableness) includes "a proportionate fee of any deal that resulted in a fee to ICP." Opp'n Br. at 23. It further argues that "a reasonable benchmark of the compensation owed to IntelCap would be the equivalent to a share of the fee on the Blue Marine deal." *Id.* This argument flies in the face of *Fallon v. McKeon*, 230 A.D.2d 629, 630, 646 N.Y.S.2d 109 (1st Dep't 1996), a case that IntelCap fails to mention much less address in its opposition.

In *Fallon*, the plaintiff alleged that, pursuant to an oral agreement, he was entitled to fifty per cent of the stock of the defendant corporation. The trial court dismissed the plaintiff's breach of contract claim on the ground that the oral agreement was void and unenforceable under the Statute of Frauds. The appellate court affirmed dismissal of that claim and, separately, held that the plaintiff's unjust enrichment claim must also fail. The court found that "instead of identifying the reasonable value of services rendered… plaintiff simply claims damages identical to the other four causes of action." *Fallon*, 230 A.D.2d at 630. Significantly, the court found this claim was insufficient even though "plaintiff asserts that such request is merely an *estimate.*" *Id.* (emphasis added).

---

between property owners and title insurance company); *Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 104 (S.D.N.Y.1986) (Weinfeld, J.) (no fiduciary relationship between author and publisher).

IntelCap's "benchmark" of its reasonable services is no different than the plaintiff's "estimate" of damages in *Fallon*. *See also Bauman Assocs. v. H&M International Transport, Inc.*, 171 A.D.2d 479, 484, 567 N.Y.S.2d 404 (1st Dep't 1991) ("[Q]uantum meruit is ... not a devise wherein a plaintiff may enforce a purported agreement which might ultimately be found not to be viable."). Consequently, IntelCap has not established a claim in *quantum meruit* and it (along with its unjust enrichment claim, which is one and the same) should be dismissed.

## CONCLUSION

For the foregoing reasons and the reasons set forth in its main brief, ICP respectfully submits that the Complaint should be dismissed with prejudice pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6), and that leave to amend should be denied.

Dated: April 9, 2009

Respectfully submitted,

/s/ Christopher J. Clark

Christopher J. Clark
Angela M. Papalaskaris
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Email: cjclark@dl.com
Email: apapalaskaris@dl.com

*Attorneys for Defendant
Institutional Credit Partners LLC*

9