USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/8/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTELLECTUAL CAPITAL PARTNER,

Plaintiff,

- against -

INSTITUTIONAL CREDIT PARTNERS LLC,

Defendant.

**MEMORANDUM DECISION**

08 Civ. 10580 (DC)

**APPEARANCES:**

CROSBY & HIGGINS LLP
By: Todd A. Higgins, Esq.
Carolyn A. Klos, Esq.
350 Broadway, Suite 300
New York, New York 10013
Attorneys for Plaintiff

DEWEY & LEBOEUF LLP
By: Christopher J. Clark, Esq.
Angela M. Paplaskaris, Esq.
1301 Avenue of the Americas
New York, New York 10019
Attorneys for Defendant

**CHIN, District Judge**

In this breach of contract case, defendant Institutional Credit Partners LLC ("ICP") moves to dismiss the complaint of plaintiff Intellectual Capital Partner ("IntelCap") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, ICP's motion is granted in part and denied in part.

## BACKGROUND

### A. The Facts

For the purposes of this motion to dismiss, the facts in the complaint are assumed to be true and are construed in the light most favorable to IntelCap.

1. **The Parties**

IntelCap is a foreign company with its principal place of business in Luxembourg. (Compl. ¶ 9). It was started in 2004 by its managing partner and sole owner, Yves Soyfer ("Soyfer"). (Id. ¶ 15). Its objective is "to originate and help in the structuring process of credit transactions in emerging markets," with a "primary focus" on Mexico and Latin America. (Id.).

ICP is a domestic limited liability corporation. In response to the Court's inquiry, the parties have advised the Court that no member of ICP is a foreign entity or citizen. (Order Feb. 23, 2009). The Court thus has subject matter jurisdiction under 28 U.S.C. § 1332.

2. **The Contract**

In January 2007, IntelCap and ICP entered into an agreement (the "Agreement"). (See id. Ex. A (hereafter "Agreement")). IntelCap was engaged to "assist ICP with business development . . . in the origination of assets on which structured financing techniques could be applied." (Compl. ¶ 22; Agreement ¶ 1). In return, ICP was to pay IntelCap an annual consulting fee, to be paid monthly. (Agreement ¶ 2). Paragraph 2(b) of the Agreement provided for a "fee sharing arrangement . . . for each deal brought to [ICP] by [IntelCap]." (Id.¶ 2(b)). By its terms, paragraph 2(b) survived termination of the Agreement. (Id. ¶ 11).

The Agreement was to continue until December 31, 2007. (Id. ¶ 3). The term and termination provision of the Agreement provided that:

> [t]his Agreement shall continue until December 31, 2007, at which point it may be extended for an additional year upon approval by both [ICP] and [IntelCap] (and may be continued for each subsequent year at each December 31st, until one or both of the parties terminate this Agreement pursuant to this Section 3 (the "Term"). This Agreement may be terminated by [ICP] or [IntelCap] at the end of any calendar year by delivering written notice to the other party prior to December 31st of such year.

(Id.).

New York State law governs the Agreement. (Id. ¶ 13)

### 3. Modification of the Contract

In April 2007, the parties agreed to modify the Agreement and insert an additional section regarding the non-solicitation of each party's clients.

> While [IntelCap] is performing services for [ICP] in accordance with this Agreement and for a period of three years after any termination of this Agreement, both [IntelCap] and [ICP] will not solicit business or perform work for the clients of the other party (i.e. [ICP] will not solicit business or perform work for [IntelCap's] clients and [IntelCap] will not solicit business or perform work for [ICP's] clients) . . . . The list of [IntelCap's] clients is presented in Exhibit B of this Agreement.

(Agreement ¶ 6).

Exhibit B of the Agreement[1] listed IntelCap's exclusive clients and included seven clients. ICP was to refrain from soliciting business from or performing any work for these seven clients during the term of the Agreement and for three years

[1] The Agreement cites to "Exhibit B"; the document attached to the Agreement, however, is titled "Appendix B." The Court assumes that Exhibit B cited in paragraph 6 of the Agreement refers to Appendix B.

following its termination, unless such work was performed with IntelCap's consent in accordance with the fee-sharing provision. (Compl. ¶ 30).

3. Performance of the Contract

IntelCap performed its obligations under the Agreement by inter alia providing ICP with insight on the Mexican market and access to IntelCap's exclusive contacts. (Id. ¶ 24). In particular, IntelCap provided ICP with information regarding contracts for Mexico's state-owned petroleum company Petroleos Mexicanos ("PEMEX"). (Id.). It also connected ICP with PEMEX contractors, including one company called Blue Marine Technology, S.A. de C.V. ("Blue Marine"), a PEMEX shipping contractor "with substantial financing needs." (Id. ¶¶ 3, 24). Blue Marine was included on the list of exclusive IntelCap clients in Exhibit B of the Agreement. (Agreement Ex. B).

IntelCap and ICP began working together on Blue Marine's financing needs, and in March 2007, ICP and Blue Marine entered into an engagement letter that expressly stated that ICP and Blue Marine had been introduced to each other by IntelCap. (Id. ¶ 25). IntelCap and ICP worked with Blue Marine "throughout the rest of 2007" to develop structured financing options on a wide variety of potential PEMEX transactions. (Id. ¶¶ 25-27). One such transaction involved a "five product tanker tender" that would satisfy the requirements of an anticipated PEMEX tender. (Id. ¶ 26-27).

4. **Soyfer's Agreement With Muzuho International**

In August 2007, Soyfer received and accepted an offer to create and co-manage a new principal investment group with Mizuho International ("Mizuho"). (Id. ¶ 32). On August 8, 2007, Soyfer informed ICP of this development "and suggested that he would not be able to continue with ICP in the same capacity in the future, but that he nonetheless looked forward to continuing the relationship." (Id.). Subsequently, ICP discontinued paying IntelCap a monthly consulting fee. (Id. ¶ 33).

Soyfer continued to "periodically confer and discuss with ICP potential financing opportunities that ICP and Mizuho could work together on, including with respect to PEMEX contracts." (Id. ¶ 34). ICP suggested that it would be willing to partner with Mizuho if IntelCap released ICP from its obligations under the Agreement; IntelCap, however, declined to do so. (Id.). Neither party took any steps to extend the Agreement at the end of 2007. (Id.).

5. **ICP's Transaction With Blue Marine**

On October 14, 2008, media reports indicated that ICP had successfully structured and arranged a $121 million financing package for Blue Marine for the acquisition of two ships to be leased to PEMEX, with an option to purchase. The deal was part of the same "five product tanker tender" for PEMEX that IntelCap and ICP had been working on for the PEMEX tender. (Id. ¶¶ 37, 38).

In November 2008, IntelCap through its attorneys sent ICP two letters requesting documentation for ICP's transaction with Blue Marine so that it could calculate its share of the fees owed to IntelCap pursuant to the Agreement's fee-sharing provision. (Id. ¶¶ 39, 40). The initial letter also reminded ICP of its continuing obligations under the non-solicitation clause of the Agreement prohibiting ICP from soliciting or doing business for Blue Marine or any of IntelCap's exclusive clients listed in Exhibit B of the Agreement, except in accordance with the fee-sharing provision of the Agreement. (Id. ¶ 39). ICP refused to provide documentation about the Blue Marine transaction or remit payment to IntelCap. (Id. ¶ 40).

B. **Procedural History**

IntelCap filed the complaint in this action on December 5, 2008. Count one alleges breach of contract; count two seeks an accounting; count three claims unjust enrichment; count four seeks quantum meruit; counts five and six seek a declaratory judgment on the scope and continuing enforceability of the fee-sharing provision at paragraph 2(b) of the Agreement and the non-solicitation provision at paragraph 6 of the Agreement, respectively. ICP moved to dismiss on March 6, 2009.

**DISCUSSION**

A. **Motion to Dismiss Standard**

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). The Supreme Court in Iqbal set out a "two-pronged" approach for courts considering a motion to dismiss. Id. at 1950.

First, the court accepts plaintiff's factual allegations as true and draws all reasonable inferences in its favor. See id.; see also Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co., 517 F.3d 104, 115 (2d Cir. 2008). The court considers only the factual allegations in the complaint and "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). Legal conclusions must be supported by factual allegations. Iqbal, 129 S. Ct. at 1949. Pleadings that are "no more than conclusions are not entitled to the assumption of truth." Id. at 1950.

Second, the court determines whether the "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." Iqbal, 129 S. Ct. at 1950. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

(citing Twombly, 550 U.S. at 557). Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

**B. Breach of Contract Claim**

ICP argues that IntelCap has failed to properly plead a breach of contract claim because it failed to allege adequate performance under the Agreement and because its repudiation of the Agreement was a material breach relieving ICP of its contractual obligations.

**1. Applicable Law**

"The elements of a breach of contract claim under New York law are as follows: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." 24/7 Records, Inc. v. Sony Music Entm't, Inc., 429 F.3d 39, 42 (2d Cir. 2005); accord O.D.F. Optronics Ltd. v. Remington Arms Co., No. 08 Civ. 4746 (DLC), 2008 WL 4410130, at *8 (S.D.N.Y. Sept. 26, 2008)(same).

A repudiation of a contract can be either "a statement by the obligor to the obligee indicating that the obligor will commit a breach that would itself give the obligee a claim for damages for total breach," or "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." Mattis v. Zheng, No. 05 Civ. 2924 (DC), 2006 WL 3155843, at *4 (S.D.N.Y. 2006) (citing Restatement (Second) of Contracts § 250 (hereafter "Restatement"); see Norcon

Power Partners, L.P. v. Niagra Mohawk Power Corp., 92 N.Y.2d 458, 463 (1998)). "When a party repudiates contractual duties prior to the time designated for performance and before all of the consideration has been fulfilled, the repudiation entitles the nonrepudiating party to claim damages for total breach." Norcon Power Partners, 92 N.Y.2d at 462-63 (quotations omitted); accord Restatement § 243. Total breach "not only renders the breacher liable in damages but it also excuses the obligee from the duty of further performance." Melodies, Inc. v. Mirabile, 179 N.Y.S.2d 991 (3d Dep't 1958); accord Restatement § 253.

**2. Application**

ICP's motion is denied as to IntelCap's breach of contract claim. At this point, ICP does not dispute that there was an agreement between IntelCap and ICP. (Compl. ¶¶ 2, 21-23). Nor does it dispute that IntelCap properly pleads breach and damages by alleging that ICP failed to adhere to the fee-sharing provision of the Agreement as to the Blue Marine transaction that was facilitated by IntelCap and closed by ICP in October 2008. (Id. ¶¶ 44-45). The issues are (1) whether IntelCap has properly alleged adequate performance of its obligations under the Agreement, and (2) whether IntelCap repudiated the Agreement, thereby excusing ICP from the duty of further performance.

IntelCap has properly alleged adequate performance of its obligations under the Agreement to maintain its contract claim. Its pleadings assert more than mere legal conclusions and instead assert factual allegations sufficient to establish

IntelCap's adequate performance. See Iqbal, 129 S. Ct. at 1950. IntelCap alleges that it "provid[ed] ICP with insight on the Mexican market, access to IntelCap's exclusive contacts, and information regarding PEMEX contracts." (Id. ¶ 24). It also alleges it "connect[ed] ICP with IntelCap's clients and PEMEX contractors, including Blue Marine," which had "immediate needs for structured financing models." (Id.). This connection to Blue Marine led to an engagement letter being signed by ICP and Blue Marine that expressly stated that ICP and Blue Marine had been introduced by IntelCap. (Id. ¶ 26).

ICP argues IntelCap failed to allege performance after August 2007, when Soyfer reached an agreement with Mizuho and informed ICP that "he would not be able to continue with ICP in the same capacity in the future." (Id. ¶ 32). The Agreement was to run until December 2007. (Agreement ¶ 3). ICP's argument, however, is contradicted by IntelCap's claim that it worked with ICP to meet Blue Marine's financing needs for the PEMEX tender, and that this work -- as well as work on "a number of other transactions" -- continued "throughout the rest of 2007." (Compl. ¶ 27).

ICP also claims that because of Soyfer's agreement with Mizuho, IntelCap was not, as a matter of law, "ready, willing or able to do all that the contract required" from August to December 2007. (Def.'s Br. at 7 (citing Roberts v. Karimi, 251 F.3d 404, 407 (2d Cir. 2001)). ICP's argument is unavailing. The complaint specifies that Soyfer -- not IntelCap -- made an

agreement with Mizuho and that Soyfer -- not IntelCap -- "suggested that he would not be able to continue with ICP in the same capacity in the future, but that he nonetheless looked forward to continuing the relationship." (Id. ¶ 32). This is not the refusal or failure to perform by IntelCap that ICP claims it to be. There is no indication that IntelCap was unwilling or unable to perform its obligations under the Agreement following Soyfer's deal with Mizuho. Indeed, IntelCap continued to work with ICP and Blue Marine "throughout the rest of 2007." Additionally, there is no indication that the terms of the Agreement restricted Soyfer from working with Mizuho or were otherwise exclusive. Accordingly, ICP's argument that the Mizuho agreement established IntelCap's failure to perform as a matter of law is rejected.

For the same reasons, ICP's argument that the Mizuho agreement, and Soyfer's remarks to ICP, constituted a repudiation is also rejected, at least as this early stage of the litigation. ICP's reliance on Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp., 301 A.D.2d 70, 77 (1st Dep't 2002), is misplaced. Unlike in Computer Possibilities Unlimited, it is not clear from the complaint that Soyfer's agreement with Mizuho prevented IntelCap from fulfilling its obligations under the Agreement. Certainly, nothing in the complaint indicates that Soyfer or IntelCap gave Mizuho the power to determine "whether [IntelCap's] contractual obligations [would] be fulfilled." Computer Possibilities Unlimited, 301 A.D.2d at 78-79. Accordingly, ICP's motion to dismiss IntelCap's breach of contract claim is denied.

C. **Declaratory Relief**

In counts five and six of the complaint, IntelCap seeks a declaratory judgment concerning the "scope and continuing enforceability" of the fee-sharing and non-solicitation provisions of the Agreement, respectively. (See Complaint ¶¶ 58-65; Agreement ¶¶ 2(b), 6). ICP moves to dismiss IntelCap's claims for declaratory relief arguing that any resolution of the breach of contract claim will necessarily resolve all issues raised by IntelCap's claims for a declaratory judgment. (Def.'s Br. at 12; Def.'s Reply at 5-6).

1. **Applicable Law**

"Declaratory relief is intended to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." Nat'l Union Fire Ins. Co. of Pittsburgh v. Int'l Wire Group, Inc., No. 02 Civ. 10338(SAS), 2003 WL 21277114, at *4 (S.D.N.Y. June 2, 2003) (citations and internal quotation quotes omitted). There must be a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003).

It is within the broad discretion of the trial court whether to exercise declaratory jurisdiction. Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003). Five factors are considered: "(i) whether the judgment will serve a useful

purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy." New York Times Co. v. Gonzales, 459 F.3d 160, 167 (2d Cir. 2006) (citing Dow Jones & Co., 346 F.3d at 359-60) (internal quotation marks omitted).

2. **Application**

ICP's motion is granted as to count five of the complaint, IntelCap's claim for a declaratory judgment on paragraph 2(b) of the Agreement (the fee-sharing provision). ICP's motion to dismiss count six, IntelCap's request for declaratory relief on paragraph 6 of the Agreement (the non-solicitation provision) is denied.

a. **Fee-sharing Provision**

The factors outlined in Gonzales weigh against IntelCap's claim for a declaratory judgment on paragraph 2(b) of the Agreement. Although declaratory relief may clarify or settle the parties' legal relations as to that provision, IntelCap's breach of contract claim accomplishes these same goals. Any "cloud of uncertainty" regarding the scope and enforceability of the provisions will be dispelled in litigation of the breach of contract claim, which also provides for damages. See Camofi

Master LDC v. College Partnership, Inc., 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) (dismissing claims for declaratory relief as duplicative of breach of contract claim).

Additionally, while the requested relief raises no federalism concerns or concerns about procedural fencing, overall I find that here declaratory relief would serve no useful purpose as the legal issues will be resolved by litigation of the breach of contract claim. Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 249-50 (S.D.N.Y. 2006) ("Plaintiffs' declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action. Therefore, the claim is duplicative in that it seeks no relief that is not implicitly sought in the other causes of action."); see also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., No. 92 Civ. 0832 (EM), 1993 WL 379589, at *2 (W.D.N.Y. Sept. 21, 1993).

Accordingly, ICP's motion to dismiss count five of IntelCap's complaint is granted, and count five is dismissed.

**b. Non-Solicitation Provision**

ICP's motion to dismiss count six of IntelCap's complaint is denied. IntelCap seeks a determination that the non-solicitation clause "survived the termination of the Agreement and requires ICP to refrain from soliciting business from or doing work for" IntelCap's exclusive clients for three years from the date of termination "unless such work is done with IntelCap's consent in accordance with the fee-sharing provision set forth in paragraph 2(b) of the Agreement." (Compl. at 17).

Though there appears to be substantial overlap, resolution of IntelCap's contract claim may not resolve questions regarding the scope and enforceability of the Agreement's non-solicitation provision. To the extent IntelCap seeks declaratory relief as to its rights vis a vis ICP's transaction with Blue Marine, IntelCap has adequately shown there to be a "substantial controversy . . . of sufficient immediacy and reality." See Duane Reade, Inc., 261 F. Supp. 2d at 295-96.

D. **Accounting**

In count two of the complaint, IntelCap seeks the equitable remedy of an accounting "for all fees generated directly and indirectly from the $121 million financing package [ICP] arranged for Blue Marine." (Compl. ¶ 48). ICP moves to dismiss on the basis that no fiduciary relationship existed between the parties that would warrant such relief.

1. **Applicable Law**

Under New York Law, to establish a right to an accounting, "a plaintiff must demonstrate the existence of a fiduciary relationship between himself and defendant, or the existence of a joint venture or other special circumstances warranting equitable relief." Millennium Expressions, Inc. v. Chauss Mktg, Ltd., No. 02 Civ. 7545(JCF), 2007 WL 950070, at *10 (S.D.N.Y. March 30, 2007) (quoting Rodgers v. Roulette Records, Inc., 677 F. Supp. 731, 738 (S.D.N.Y. 1988); see also Penato v. George, 52 A.D.2d 939, 942 (2d Dep't 1976).

2. Application

ICP's motion is granted, and IntelCap's claim for the equitable remedy of an accounting is dismissed; IntelCap, however, is entitled to discovery on damages for its other claims, including discovery on fees generated from the Blue Marine transaction and ICP's profits.

IntelCap does not allege any fiduciary relationship or joint venture with ICP that would warrant the equitable remedy of an accounting; nor has it alleged other special circumstances warranting equitable relief. There is no indication that IntelCap's relationship with ICP was "founded upon trust or confidence reposed by one person in the integrity and fidelity of another." See S.O. Textiles Co., Inc. v. A&E Products Group, 18 F. Supp. 2d 232, 242 (E.D.N.Y. 1998) (accounting claim dismissed where parties' relationship "purely commercial"). In fact, IntelCap alleges that "[f]rom the outset of the parties' relationship, IntelCap had concerns regarding the best way to protect itself and the exclusive client and contact list it had accumulated." (Compl. ¶ 28). The non-solicitation provision at paragraph 6 of the Agreement was negotiated and inserted into the Agreement as a result of these concerns. (Id. ¶ 29).

IntelCap argues that ICP's receipt of a fee from the Blue Marine transaction made it a "custodian" of IntelCap's property, thereby creating "special circumstances warranting equitable relief. (Pl.'s Opp'n at 19-20 (citing Rodgers, 677 F. Supp. at 738)). IntelCap's reliance on Rodgers is misplaced,

however. The court in Rodgers actually rejected the plaintiff's argument that a fiduciary relationship was created by defendants' collection of money on behalf of plaintiff in the form of royalties or license fees; the court instead deemed the parties' relationship a "contractual relationship." Rodgers, 677 F. Supp. at 738 (citing cases). Similarly, here the parties' fee-sharing agreement and ICP's obligation to pass fees on to IntelCap are insufficient to make ICP a fiduciary of IntelCap or otherwise put ICP and IntelCap in a relationship of trust or confidence.

Accordingly, ICP's motion to dismiss count two of IntelCap's complaint seeking an accounting is granted. Nevertheless, IntelCap is still entitled to conduct discovery and seek damages for its other remaining claims.

## E. Unjust Enrichment and Quantum Meruit

Finally, ICP moves to dismiss counts three and four of IntelCap's complaint.

### 1. Applicable Law

To recover under quantum meruit in New York a party "must establish performance of [its duties] in good faith, acceptance of the services by persons to whom such services were rendered, expectation of compensation, and the reasonable value of such services." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir.2005); see also Fluor Daniel Carribean, Inc. v. Humphreys (Cayman) Ltd., No. 04 Civ. 686 (DC), 2005 WL 1214278, at *5 (S.D.N.Y. May 23, 2005). "To state a claim for unjust enrichment in New York, a plaintiff

must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." Kidz Cloz, Inc. v. Officially for Kids, Inc., 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004) (internal quotations omitted). Unjust enrichment and quantum meruit claims are not separate causes of action and are reviewed together. Mid-Hudson Catskill Rural Migrant Ministry, Inc., 418 F.3d at 175.

**2. Application**

IntelCap has adequately pleaded claims for unjust enrichment and quantum meruit. Where, as here, the existence of an enforceable contract is disputed, these claims may proceed alongside IntelCap's breach of contract claim as alternative theories. See Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007) ("When there is a bona fide dispute as to the existence of a contract, a party may proceed upon a theory of unjust enrichment, and an unjust enrichment claim may be alleged alongside a breach of contract claim.").

Additionally, ICP's argument that IntelCap has failed to allege the reasonable value of its services is premature. IntelCap alleges that ICP accepted and benefitted from its services but failed to share fees generated from the Blue Marine deal; it claims the fees represented the reasonable value of its services. (Compl. ¶¶ 51, 56; Pl.'s Opp'n at 22-23). While the alleged value of IntelCap's services may be duplicative of its contract claim, at this stage in the litigation, IntelCap is

permitted to proceed with its claims for quantum meruit and unjust enrichment. ICP's motion to dismiss counts three and four of the complaint is denied.

**CONCLUSION**

For the foregoing reasons, ICP's motion to dismiss is denied in part and granted in part. Counts two and five of the complaint seeking, respectively, an accounting and declaratory relief on paragraph 2(b) of the Agreement are dismissed. IntelCap may proceed on its breach of contract and quantum meruit and unjust enrichment claims, as well as its claim for a declaratory judgment on the scope and enforceability of paragraph 6 of the Agreement.

As previously ordered by the Court, all discovery, fact and expert, shall be completed by September 25, 2009. The parties shall appear for a pre-trial conference that day at 2 p.m.

SO ORDERED.

Dated: New York, New York
July 8, 2009

DENNY CHIN
United States District Judge